# EXHIBIT A

1  ALEXANDER E. WOLF (SBN 299775)
   awolf@milberg.com
2  JOHN J. NELSON (SBN 317598)
   jnelson@milberg.com
3  **MILBERG COLEMAN BRYSON PHILLIPS**
   **GROSSMAN, PLLC**
4  280 South Beverly Drive, Penthouse
   Beverly Hills, California 90212
5  Tel: 872-365-7060
6
   Attorneys for Plaintiff
7

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**5/16/2025 12:31 PM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By J. Covarrubias, Deputy Clerk**

8
9
10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
11                      **COUNTY OF LOS ANGELES**
12  TAL NELKIN, individually and on behalf of all    Case No. 25STCV14669
    similarly situated persons,
13                                                    **CLASS ACTION COMPLAINT**
                            Plaintiff,
14                                                    JURY TRIAL DEMANDED
15              v.
16  HELLO PRODUCTS LLC, a Delaware limited
    liability company,
17                      Defendant.
18
19
20
21
22
23
24
25
26
27
28

                            CLASS ACTION COMPLAINT

Plaintiff Tal Nelkin ("Plaintiff"), on behalf of himself and of all others similarly situated ("Class" or "Class Members"), brings this class action complaint against Defendant Hello Products LLC ("Defendant" or "Hello Products"). The allegations asserted herein are based on Plaintiff's personal knowledge of facts pertaining to himself and upon information and belief, including further investigation conducted by Plaintiff's counsel, as to the remainder.

## I.    NATURE OF THE ACTION.

1.    Plaintiff respectfully commences this class action to stop Defendant's deceptive, unfair, and unsafe business practice of manufacturing, distributing, advertising, marketing, and selling its toothpaste products which contain or risk containing dangerously high levels of heavy metals like lead and mercury. The products at issue are all of Defendant's Hello-branded toothpastes, including without limitation Hello Fluoride Free Toothpaste Fresh Watermelon and Hello Fluoride Toothpaste Dragon Dazzle (the "Products").

2.    Defendant is a manufacturer and seller of toothpaste. Plaintiff is one of many consumers who purchased toothpaste for regular and ordinary use.

3.    Prior to placing the Products into the stream of commerce and the hands of consumers to use on themselves and their children, Defendant knew or should have known that the Products contained or risked containing dangerous levels of lead and/or mercury. Yet Defendant omitted this information on packaging and otherwise failed to warn about the presence or risk of presence of dangerous heavy metals.

4.    Plaintiff and Class Members reasonably relied on Defendant's representations and omissions which led them to believe the Products were safe, unadulterated, and free of dangerous levels of heavy metals.

5.    Plaintiff and Class Members purchased and/or used the Products and were therefore exposed to, or risked being exposed to, the harmful presence of heavy metals linked to adverse health conditions.

6.    The heavy metals are avoidable constituents in the Products and Defendant's manufacturing process. Indeed, the heightened presence of lead and mercury renders the Products adulterated, misbranded, and illegal to sell, manufacture, or distribute.

CLASS ACTION COMPLAINT

Exhibit A
Page 015

7.      Defendant is therefore liable to Plaintiff and Class Members for selling, advertising, manufacturing, and distributing the Products without conspicuously disclosing that the Products contain or risk containing dangerous levels of heavy metals.

## II.      PARTIES.

8.      Plaintiff Tal Nelkin is, and at all times relevant to this action was, a resident of Los Angeles County, California. Plaintiff therefore is a citizen/domiciliary of California.

9.      On information and belief, Defendant is, and at all times relevant to this action was, a Delaware limited liability company with its principal place of business in Illinois. Defendant sells, manufactures, and/or distributes the Products, including to consumers in California and nationwide.

## III.     JURISDICTION AND VENUE.

10.     This is a class action lawsuit brought pursuant to Code of Civil Procedure § 382, and this Court has jurisdiction over Plaintiff's claims because the amount in controversy exceeds this Court's jurisdictional minimum.

11.     Venue is proper because Defendant does business in California, sells and/or distributes products to consumers in California, and a substantial part of Defendant's conduct giving rise to the claims occurred in California. On information and belief, Defendant knowingly sells the Products to customers in this county through websites, stores, and third-party retailers and distributors. Venue is thus proper pursuant to California Code of Civil Procedure §§ 395 and 395.5, California Business and Professions Code §§ 17203, 17204, and 17535, and California Civil Code § 1780(d) because Defendant does business in this county and one of Plaintiff's transactions with Defendant took place in this county.

12.     Further, as set forth herein, Defendant has contacts in this forum sufficient to subject it to personal jurisdiction. Defendant continuously and systematically places goods into the stream of commerce for distribution in California, offers to ship products to California, markets the Products to persons in California, and manufactures and supplies the Products to third-party sellers to sell to consumers in California. Exercising jurisdiction over Defendant is fair, just, and reasonable considering the quality and nature of Defendant's acts that occur in California, and which affect interests located in California. Defendant has purposefully availed itself of the privilege of conducting activities in California, and should reasonably anticipate being haled into court in California.

3

## IV.    FACTUAL ALLEGATIONS.

### A.    Defendant is a Prominent, Knowledgeable, and Experienced Manufacturer and Seller of Toothpaste.

13.    Toothpaste is a hygiene product used daily. Its purpose is simple—to promote and maintain oral hygiene. For example, toothpaste aids in removing dental plaque and food from the teeth, assists in suppressing halitosis, and delivers active ingredients (most commonly fluoride) to help prevent tooth decay (dental caries) and gum disease (gingivitis).

14.    Defendant is among the leading toothpaste brands in the United States. On information and belief, sales of Hello-brand toothpaste in California alone total tens of millions per year.

15.    Defendant prides itself as a major and influential player in the toothpaste market. According to Defendant's "About Us" webpage, Defendant states it makes "friendly products" and "we believe it's high time oral and personal care got a whole lot more friendly for you and your family. hello makes products that are relevant. beautiful. welcoming. and good-for-you."[1]

16.    Defendant states its goal is "making the world a friendlier place, starting with your mouth [¶] hello is a new kind of friendly personal care, created by a small, entrepreneurial crew using thoughtful ingredients so delicious you'll rush to brush. for reals."[2]

17.    Defendant touts itself as experienced, knowledgeable, and a pioneer in the tooth space market, including: "hello is a new kind of friendly personal care"; "delicious, natural flavors that taste awesome af."; "our products work great and are free from artificial sweeteners, dyes, flavors, and parabens."; "we love people, the planet, and design. that's why hello is pretty."; "our products mirror our values, aiming for a happier world with more smiles."; and "not tested on animals."[3]

### B.    Study Recently Uncovers Dangerous Levels of Lead and Mercury in the Products.

---

[1] https://www.hello-products.com/pages/about-us

[2] *Id.*

[3] *Id.*

18.     Lead Safe Mama LLC ("Lead Safe Mama") is a consumer safety organization and advocate that conducts "independent, community-funded, scientific testing of consumer goods."[4]

19.     Lead Safe Mama recently tested various toothpastes widely available in the marketplace, including certain Hello-brand toothpaste. The findings were published in early 2025 and continue to be updated as of April 22, 2025.[5]

20.     Lead Safe Mama specifically tested two of the Products—Hello Fluoride Free Toothpaste Fresh Watermelon and Hello Fluoride Toothpaste Dragon Dazzle—which showed the Products contained dangerous and alarmingly high levels of lead and mercury.

    a.  The Hello Fluoride Free Toothpaste Fresh Watermelon tested for 493 ppb (parts per billion) of lead and 19 ppb of mercury.[6]

    b.  The Hello Fluoride Toothpaste Dragon Dazzle tested for 428.4 ppb of lead and 11.8 ppb of mercury.[7]

**C.     Exposure to Heavy Metals from the Products is Dangerous.**

21.     Heavy metals bioaccumulate in the body. This means the body cannot excrete and expel toxins as quickly as they are absorbed, so the amount present in the body—along with the associated negative health risks—grows over time.[8]

22.     The U.S. Food and Drug Administration (FDA) and World Health Organization (WHO) have declared heavy metals "dangerous to human health."[9]

---

[4] Lead Safe Mama, *Chart Comparing the Toxicant Profiles of Popular Toothpaste and Tooth Powder Products Tested by an Independent, Third-Party Lab in 2025*, available at https://tamararubin.com/2025/01/toothpaste-chart (hereinafter, the **"Lead Safe Mama Chart."**)

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Heavy Metals in Baby Food: What You Need to Know*, Consumer Reports (Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

[9] *Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, U.S. House of Representatives Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Feb. 4, 2021 ("House Report") at 2, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

CLASS ACTION COMPLAINT

23.    For example, exposure to heavy metals puts children at risk for diminished mental capacity, behavioral problems (like attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues.

24.    Heavy metals also pose health risks to adults.  Even modest amounts of ingested heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions. These facts underscore the importance of limiting heavy metal exposure and consumption.

25.    It is particularly important to limit or eliminate heavy metals from household products, like toothpaste, which are used daily and absorbed or ingested into the blood stream.

        **1.    Lead.**

26.    The Products contain unsafe levels of lead, which in adults can suppress the immune system and cause hypertension,[10] plus "kidney damage, cardiovascular problems, reproductive damage, and brain damage, and in children can lead to brain and nervous system damage, learning disabilities, behavioral problems, and developmental delays."[11]

27.    Lead exposure can seriously harm the brain and nervous system and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. Lead exposure can also lead to cancer.

28.    Children are at especially high risk of developing adverse effects from lead exposure due to their developing brains, and because, compared to adults, less lead is stored by the body in bones and teeth and more in the nervous system.[12]

---

[10] Leigh-Ann Jackson, *Dangerous Chemicals Were Detected in 100% of the Braiding Hair We Tested*, Consumer Reports (Feb. 27, 2025), available at https://www.consumerreports.org/health/wigs-hair-extensions/dangerous-chemicals-detected-in-braiding-hair-cr-tested-a4850978424/.

[11] Karen Feldscher, *Synthetic Braiding Hair Used by Black Women Contain Dangerous Chemicals*, Harvard T.H. Chan School of Public Health (Mar. 5, 2025), available at https://hsph.harvard.edu/news/synthetic-braiding-hair-used-by-black-women-contain-dangerous-chemicals/.

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1314903

Exhibit A
Page 019

29.    No amount of lead is safe for human exposure or consumption. Indeed, according to the FDA, CDC, and WHO, there is no "safe" level of lead in blood.[13]

30.    According to the CDC, "Testing products in a laboratory is the only way to tell for certain if the product contains lead. It is best to avoid the use of products that may contain lead."[14]

31.    As noted above, bodily exposure to lead builds up over time. Buildup has been clinically shown to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, in addition to serious injuries to the nervous system, organs, and body systems.

32.    "Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time."[15]

33.    Of note, "[r]epeated low-level exposure [to lead] over a prolonged period" can result in "chronic poisoning" and adverse symptoms including "persistent vomiting, encephalopathy, lethargy, delirium, and coma."[16] This has occurred when blood lead levels reach 40 to 60 µg/dl.[17] Moreover, "Elevated levels of lead exposure have been consistently associated with a range of kidney abnormalities, even when lead concentrations are relatively modest, such as around 10 µg/dl."[18] And, for context, 1 µg/dl equates to .01 ppm (parts per million) or 10 ppb (parts per billion).[19]

---

[13] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016), available at https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health ("No amount of lead is known to be safe."); *Lead in Food and Foodwares*, FDA, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last updated Jan. 6, 2025); *About Childhood Lead Poisoning Prevention*, Centers for Disease Control and Prevention, https://www.cdc.gov/lead-prevention/about/index.html?CDC_AAref_Val=https://www.cdc.gov/nceh/lead/prevention/healtheffects.html ("There are no safe levels of lead in the blood.") (last visited Apr. 25, 2025).

[14] https://www.cdc.gov/lead-prevention/prevention/foods-cosmetics-medicines.html.

[15] https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf at 49.

[16] Bhasin, et al., *Unveiling the Health Ramifications of Lead Poisoning: A Narrative Review* (Oct. 9, 2023), available at https://www.cureus.com/articles/184381-unveiling-the-health-ramifications-of-lead-poisoning-a-narrative-review#!/.

[17] *Id.*

[18] *Id.*

[19] https://www.endmemo.com/concentration_solution/microgram_deciliterpartpermillion.html.

7

34.    In short, lead is extremely toxic even at low levels, and especially so over an extended time.

### 2.    Mercury.

35.    "Mercury is a naturally-occurring chemical element found in rock in the earth's crust, including in deposits of coal."[20] "In its inorganic form, mercury occurs abundantly in the environment, primarily as the minerals cinnabar and metacinnabar, and as impurities in other minerals."[21]

36.    "Mercury exposure at high levels can harm the brain, heart, kidneys, lungs, and immune system of people of all ages. High levels of methylmercury in the bloodstream of babies developing in the womb and young children may harm their developing nervous systems, affecting their ability to think and learn."[22]

37.    "High exposure to inorganic mercury may result in damage to the gastrointestinal tract, the nervous system, and the kidneys."[23] "Both inorganic and organic mercury are absorbed through the gastrointestinal tract and affect other systems through this route."[24] "Symptoms of high exposures to inorganic mercury include: skin rashes and dermatitis; mood swings; memory loss; mental disturbances; and/or muscle weakness."[25]

38.    Importantly, "exposure to mercury – even in small amounts – may cause serious health problems, and is a threat to the development of the child in utero and early in life."[26] For example, "Mild, subclinical signs of central nervous system toxicity can be seen in workers exposed to an elemental mercury level in the air of 20 µg/m3 or more for several years. Kidney effects have been reported, ranging from increased protein in the urine to kidney failure."[27]

---

[20] https://www.epa.gov/mercury/basic-information-about-mercury.

[21] *Id.*

[22] *Id.*

[23] https://www.epa.gov/mercury/health-effects-exposures-mercury

[24] *Id.*

[25] *Id.*

[26] World Health Organization, *Mercury and Health*, available at https://www.who.int/news-room/fact-sheets/detail/mercury-and-health.

[27] *Id.*

CLASS ACTION COMPLAINT

39.     Stated differently, mercury "even at low concentrations . . . can have harmful long-term health effects, causing headaches, limb pain, tooth loss, or general weakness."[28]

**D.     The Levels of Heavy Metals in the Products are Dangerous.**

40.     According to the U.S. Environmental Protection Agency (EPA), Maximum Contaminant Level Goals (MCLGs) are "non-enforceable health goals" based on "possible health risks."[29] The EPA also sets "an enforceable regulation called a maximum contaminant level (MCL) based on the MCLG. MCLs are set as close to the MCLGs as possible, considering cost, benefits and the ability of public water systems to detect and remove contaminants using suitable treatment technologies."[30]

41.     The EPA set the MCLG for lead at zero, and the MCL at 0.010 mg/L (equivalent to 0.01 ppm or 10 ppb).[31] The "EPA has set this level based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[32]

42.     For inorganic mercury, the EPA set both the MCLG and MCL to 0.002 mg/L (equivalent to 0.002 ppm or 2 ppb).[33]

43.     The levels of lead and mercury in the Products far exceed these thresholds many times over. Specifically:

a.     The 493 ppb of lead in Hello Fluoride Free Toothpaste is 49 times the EPA's MCL level, and the 19 ppb of mercury is 9 times the EPA's MCL level.

[28] Charkiewicz et al., *Mercury Exposure and Health Effects: What Do We Really Know?*, Int'l Journal of Molecular Science (Mar. 5, 2025), available at https://www.mdpi.com/1422-0067/26/5/2326.
[29] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.
[30] *Id.*
[31] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations
[32] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water
[33] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations.

9

b.  The 428.4 ppb of lead in Hello Fluoride Toothpaste is 42 times the EPA's MCL level, and the 11.8 ppb of mercury is over 5 times the EPA's MCL level.

44.  The FDA regulates heavy metals too. According to the FDA, "action levels" are the levels at which the FDA considers food to be "contaminated" under Section 402(a)(1) of the federal Food, Drug, and Cosmetic Act. In January 2025, the FDA set "action levels" ranging from 10 ppb to 20 ppb for lead in foods for children under two years old.[34] The lead levels in the Products exceed these thresholds many times over.

45.  This especially concerning because toothpaste is swallowed and absorbed sublingually when used by adults, and even more so by young children.

**E.  Toothpaste Can Be Manufactured Without Detectible Lead and Mercury.**

46.  Based on present day manufacturing capabilities, toothpaste can be manufactured without detectible levels of lead and mercury in finished products.

47.  To that end, according to Lead Safe Mama, competing toothpaste brands have manufactured toothpaste with non-detectable levels (less than 5 ppb and likely zero) of lead and mercury.[35] These include:

a.  Orajel Kids Training Toothpaste in Natural Berry Fruity Flavor, Elmo Sesame Street Packaging, Fluoride-free

b.  Miessence Mint Toothpaste, Fluoride Free

c.  Dr. Brown's Fluoride-free Baby Toothpaste in Strawberry Flavor

d.  Pegciz Kids Foam Toothpaste (Low Fluoride) in Watermelon Flavor

e.  Kid's Spry Tooth Gel with Xylitol in Original Flavor

48.  Accordingly, the reasonable consumer's expectations described herein are in fact reasonable and do not set an impossible standard.

---

[34] https://www.fda.gov/media/164684/download.

[35] https://tamararubin.com/2025/01/toothpaste-chart/.

CLASS ACTION COMPLAINT

**F.** **Reasonable Consumers are Deceived by Defendant's Failure to Disclose that the Products Contain or Risk Containing Unsafe Levels of Heavy Metals.**

49.     Defendant's Products should not have contained unsafe levels of heavy metals. And Defendant failed to disclose on the Products' labeling (or anywhere in Defendant's point-of-sale marketing) that the Products contain or risk containing unsafe levels of heavy metals.

50.     As explained above, Defendant positions itself and its brand as trustworthy, safe, and responsible to consumers. Defendant's advertising and labeling is designed to reinforce this message. To that end, exemplars of the Products' packaging and advertising (collected from publicly available sources) are shown below.

**<u>Hello Fluoride Free Toothpaste for Kids All Ages - Watermelon</u>**



Share

Hello Watermelon Kids Toothpaste, Fluoride Free Kid Toothpaste, Safe to Swallow Toddler Toothpaste and Baby Toothpaste, No Artificial Sweeteners, No SLS, Gluten Free, Pack of 3, 4.2 OZ Tubes

Visit the hello Store
★★★★★ ˅    3,446 ratings  |  21 answered questions
Amazon's Choice  In Toothpaste by hello

Price: $12.20 ($0.97 / Ounce)

Style: 3 pack


$12.84 ($1.02 / Ounce)


2 options from $29.99

Roll over image to zoom in

Brand         Hello

**About this item**

- Contains three (3) 4.2 oz. tubes of Hello Watermelon Kids Toothpaste, Fluoride Free Kid Toothpaste
- This kids watermelon toothpaste is thoughtfully formulated with high quality ingredients like xylitol, erythritol, soothing aloe vera, and a silica blend that gently polishes growing teeth
- Always have extra toddler toothpaste and baby toothpaste tubes on hand with this kid toothpaste pack of 3
- Build good oral care habits and make morning and nighttime brushing fun using this Hello watermelon toothpaste kids love and that is safe to swallow for all ages
- Polish and brighten growing teeth and remove icky plaque with this amazing watermelon flavored kids fluoride free toothpaste

CLASS ACTION COMPLAINT

Exhibit A
Page 024

**Product Description**

Say hello to a naturally friendly fluoride free kids toothpaste that tastes so delish they'll lose their mind with Hello Watermelon Kid Toothpaste. This 3 pack of watermelon flavored Hello kids toothpaste is thoughtfully formulated with high quality ingredients like xylitol and erythritol, soothing aloe and a silica blend that gently polishes and brightens teeth. Plus, this toothpaste for kids removes plaque, because let's face it, we're friendly but plaque? Not so much. Best of all, this toddler toothpaste and baby toothpaste is safe to swallow for little ones still learning to brush and it's formulated without mint so kids can say goodbye to spicy, and hello to natural flavors that'll make them smile wide. Hello contains no artificial sweeteners, no artificial flavors, no dyes, no microbeads, no parabens, no SLS and no gluten. Hello is also vegan, not tested on animals (Leaping Bunny Certified and PETA recognized), and made in the USA. Choose friendly, brush happy.

*Images dated May 15, 2025 (Amazon.com)*




### Hello Natural Watermelon Flavor Kids Fluoride Free Toothpaste and Mouthwash, Vegan, Alcohol Free, SLS Free, Gluten Free, 4.2 Ounce Toothpaste Tubes (Pack of 2), 16 Fl Oz Mouthwash Bottle

Visit the hello Store

⭐⭐⭐⭐⭐ ⌄   2,710 ratings  |  17 answered questions

Amazon's Choice   in Children's Toothpaste by hello

$**14**⁴² ($14.42 / Count)

*Images dated May 15, 2025 (Amazon.com)*

### Hello Fluoride Free Toothpaste for Kids All Ages – Smiling Shark Fruit Punch



### hello Smiling Shark Fluoride Free Kids Toothpaste, Natural Fruit Punch, 4.2 Oz Tube (Pack of 3)

Visit the hello Store

4.7 ⭐⭐⭐⭐⭐ ⌄   26,366 ratings  |  Search this page

Amazon's Choice

800+ bought in past month

-14% $**12**⁹³ ($1.03 / Ounce)

List Price: $14.99 ⓘ

**Get Fast, Free Shipping** with Amazon Prime
FREE Returns ⌄
Get a $50 Amazon Gift Card instantly upon approval for Amazon Visa. No annual fee.

CLASS ACTION COMPLAINT

Exhibit A
Page 025

## About this item

- WHAT I'M GETTING: Includes three (3) 4.2 oz tubes of hello Smiling Shark Fluoride Free Kids Toothpaste, Natural Fruit Punch flavored
- SWALLOW SAFE: This magical kids fluoride free toothpaste is safe for all ages and helps remove plaque with regular brushing
- MAGICALLY BRILLIANT: The fintastic Fruit Punch kids toothpaste flavor tastes magical and works brilliantly as a training toothpaste to build good brushing habits
- NO BAD STUFF ALLOWED: This toddler toothpaste is made with no parabens, dyes, titanium dioxide, sugar, artificial sweeteners or artificial flavors, and is gluten free
- FINS UP: Savor the jawsome fruit punch flavor and make a big splash when it's time to brush with hello Smiling Shark Fluoride Free Kids Toothpaste





*Images dated May 15, 2025 (Amazon.com)*

CLASS ACTION COMPLAINT

Exhibit A
Page 026

### Hello Fluoride Toothpaste Dragon Dazzle



**hello Dragon Dazzle Kids Toothpaste with Fluoride, Blue Raspberry Toothpaste, 4.2 Oz Tube**

★★★★★ (4.8) | 276 ratings

**Multipack Quantity: 1**

| 1 |
|---|
| $4.96 |
| $1.18/oz |

**About this item**

- WHAT I'M GETTING: Includes one (1) 4.2 oz tube of hello Dragon Dazzle Kids Toothpaste with Fluoride, Blue Raspberry Toothpaste for Kids
- FIGHTS CAVITIES: This kids fluoride toothpaste is safe for children ages 2 and up, helps prevent cavities and strengthens growing teeth using fluoride
- MAGICALLY BRILLIANT: The dragon kid toothpaste tastes like magic and works brilliantly to build good brushing habits and help brush away plaque
- DAZZLING BRIGHT: hello Dragon Dazzle Kids Toothpaste is formulated with natural flavor and high quality ingredients
- NO BAD STUFF: This gluten-free toothpaste is made with no SLS, preservatives, parabens, dyes, spicy mint, artificial sweeteners or flavors
- Child
- Raspberry

*Image dated May 15, 2025 (Walmart.com)*

51.     The above representations on labeling and in advertising, taken individually and collectively, lead reasonable consumers to believe that the Products (1) are safe to use regularly for children and adults, (2) are beneficial to health and hygiene, and (3) do not contain or risk containing unsafe levels of dangerous heavy metals like lead and mercury.

52.     Indeed, statements like "safe to swallow," "no artificial sweeteners," "Build good oral care habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "no artificial sweeteners," "no dyes," "no parabens," and "no titanium dioxide," plus a description of the product as toothpaste for children, a "kids toothpaste," or for "kids all ages," taken individually and

CLASS ACTION COMPLAINT

Exhibit A
Page 027

1  collectively, all lead reasonable consumers to believe that the Products are safe for regular use and do not

2  contain or risk containing unsafe levels of toxins.

3      53.    Any reasonable consumer would consider the potential presence of dangerous substances

4  at unsafe levels important information. Indeed, had the potential presence of dangerous substances at

5  unsafe levels been disclosed by Defendant, the Products would not have been on the shelves and/or

6  reasonable consumers would not purchase them.

7      54.    When faced with two toothpaste options in a store—one which does not contain or risk

8  containing dangerous levels of heavy metals, and another which contains or risks containing dangerous

9  levels of heavy metals—reasonable consumers would avoid the latter. This is because the material risk

10  of physical harm brings into question the Products' core functionality, which is to help consumers

11  maintain health and hygiene. Absent adequate pre-sale disclosures on packaging, reasonable consumers

12  are deprived of making an informed choice.

13      55.    The above deception is particularly material in the context of toothpaste. These Products

14  are used daily and come in direct contact with a person's mouth. With each use, the Products are ingested

15  or quickly absorbed into bodily systems, particularly when swallowed or placed under the tongue.

16  **G.    Defendant's Duty to Disclose.**

17      56.    Defendant was obligated to disclose that the Products contained or risk containing unsafe

18  levels of heavy metals.

19      57.    Defendant could have and should have prominently disclosed the limitations and omitted

20  facts on packaging or at the point of sale—all prior to purchase. Had Defendant disclosed that the

21  Products contain or risk containing unsafe levels of heavy metals, consumers would have been aware of

22  it.

23      58.    <u>Superior Knowledge</u>: Defendant is experienced in the design and manufacture of

24  toothpaste like the Products at issue. On information and belief, as a manufacturer and company whose

25  goal is to improve oral hygiene, Defendant is aware of the raw inputs used to manufacture the Products

26  and, thus, was aware that the Products were manufactured with heavy metals and present in the finished

27  Products. Further, on information and belief, Defendant conducts tests, including pre-sale testing, to

28

1  verify the contents and specifications of the Products sold. Indeed, Defendant repeatedly touts that its

2  products are free of "bad" and harmful ingredients as a way to differentiate itself in the marketplace.

3      59.    Active Concealment: Defendant actively concealed the Products' shortcomings described

4  above. On information and belief, in response to third-party inquiries regarding the safety of its products,

5  Defendant maintained that its products were safe and denied that the Products contained or risked

6  containing unsafe levels of heavy metals.  Further, contrary to the presence or potential presence of heavy

7  metals, Defendant aggressively advertises the Products as safe for children and adults in marketing

8  materials. These are acts of active concealment.

9      60.    Contrary/Partial Representations: As explained above, Defendant describes the Products

10  on packaging and advertising as "safe to swallow," "no artificial sweeteners," "Build good oral care

11  habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "no

12  artificial sweeteners," "no dyes," "no parabens," and "no titanium dioxide," yet Defendant fails to

13  disclose the risk or presence of unsafe levels of heavy metals. By disclosing some beneficial attributes

14  about the Products' safety and expected performance, Defendant is obligated to disclose material

15  limitations that negatively affect the use of the Products.

16      61.    The dangerous propensity affects the central functionality of the Products in that it renders

17  them unusable as intended. For the same reasons, the Products present an unreasonable safety hazard

18  because the products are dangerous to health.

19  **H.    Carcinogens and Toxins Render the Products Adulterated, Misbranded, and Illegal to**

20        **Sell.**

21      62.    The FDA has several safety and effectiveness regulations in place that govern the

22  manufacture and marketing of cosmetic products.[36]

23      63.    As cosmetic products regulated by the FDA, the Products are prohibited from being

24  adulterated or misbranded. See Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 361, 362 ("FDCA").

25

26

27      [36] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-

28  cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Aug. 3, 2013).

16

CLASS ACTION COMPLAINT

64.    A cosmetic is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual . . . ." 21 U.S.C. § 361(a).

65.    A cosmetic shall be deemed to be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 362(a).

66.    Defendant could have avoided any potential for unsafe lead and mercury in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with zero (or virtually zero) lead and mercury.

67.    The heightened levels of lead and mercury render the Products both adulterated and misbranded under the FDCA. Each of the Products are adulterated because each "contains [a] poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof." 21 U.S.C. § 361(a).

68.    The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the dangerous levels of heavy metals. 21 U.S.C. § 362(a).

69.    A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

70.    California's Sherman Food, Drug, and Cosmetic Law has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by Cal. Health & Safety Code § 111670 mirrors the FDA definition, defining an adulterated cosmetic as one that "bears or contains any poisonous or deleterious substance that may render it injurious to users under the conditions of use prescribed in the labeling or advertisement of the cosmetic, or under conditions of use as are customary or usual." Under the California law, cosmetics are required to satisfy all of the labeling requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 301, et seq.), and the federal Fair Packaging and Labeling Act (15 U.S.C. Sec. 1451, et seq.). *See* Cal. Health & Safety Code § 110371.

71.    It is unlawful in the state of California to distribute cosmetics if its packaging or labeling does not conform to the provisions of California and/or Federal law. Cal. Health & Safety Code § 110385.

CLASS ACTION COMPLAINT

Exhibit A
Page 030

72.     Further, it is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular. Cal. Health & Safety Code § 110390.

73.     It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded. Cal. Health & Safety Code § 110398.

74.     As alleged herein, Defendant has violated the FDCA, the Sherman Food, Drug, and Cosmetic Law, California's Unfair Competition Law ("UCL"), Consumer Legal Remedies Act, ("CLRA"), and False Advertising Law ("FAL"). Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding heavy metals in the Products.

75.     Defendant had and has a duty to ensure that its Products did not contain or have a material risk of containing excessive levels of lead and mercury, including through regular testing, especially before injecting the Products into the stream of commerce for consumers to use on themselves.

**I.      Plaintiff's Experience.**

76.     Plaintiff purchases toothpaste regularly, roughly every month or two. In the last three years, Plaintiff repeatedly purchased the Products, including from Amazon. For example, on May 1, 2023, Plaintiff purchased Hello Natural Watermelon Flavor Kids Fluoride Free Toothpaste from Amazon.com. On March 4, 2025 and May 17, 2024, Plaintiff purchased Hello Smiling Shark Fluoride Free Kids Toothpaste from Amazon. And on February 5, 2025 and September 18, 2024, Plaintiff purchased Hello Antiplaque Toothpaste Fluoride Free for Adults.

77.     Representative examples of the Products' packaging are shown in the paragraphs above.

78.     Before purchasing the Products, Plaintiff viewed the portions of the Amazon.com listing descriptions the Products' beneficial attributes. Accordingly, as shown above, he saw that the Products were generally described as: "safe to swallow," "no artificial sweeteners," "Build good oral care habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "no artificial sweeteners," "no dyes," "no parabens," and "no titanium dioxide," plus a description of certain Products as toothpaste for children, "kids toothpaste," or for "kids all ages"—or similar statements with minor variations.

79.    Plaintiff understood these statements by Defendant as representing that the Products (1) were properly manufactured, (2) were safe for regular use as a toothpaste, (3) were safe for children (for the children's Products), and (4) did not contain or risk containing levels of heavy metals in excess of thresholds deemed safe.

80.    Plaintiff relied on these representations in deciding to purchase the Products.

81.    Plaintiff would not have purchased the Products, or at minimum would have paid less for then, had he known that the Products contained (or risked containing) unsafe or dangerous levels of heavy metals as described herein.

82.    Plaintiff would not have purchased the Products, or at minimum would have paid less for then, had he known that the Products contained (or risked containing) levels in excess of thresholds deemed safe by healthcare industry advocates.

83.    The Products were not, in fact, properly manufactured, free from defects, safe for intended use, and truthfully advertised. Each Product Plaintiff purchased was worthless because it either contained or risked containing dangerous levels of heavy metals.

84.    Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's deceptive and unfair conduct.

85.    Plaintiff continues to be interested in purchasing toothpaste that does not contain or risk containing unsafe levels of heavy metals, but will be unable to trust and rely on Defendant's packaging, and so will not purchase Defendant's Products. Plaintiff would be willing to purchase the Products again with the assurance that Defendant does not omit the presence of unsafe levels of heavy metals on labeling, and that the Products do not contain or risk containing unsafe levels of heavy metals.

## V.    CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action on behalf of himself and all persons similarly situated pursuant to Section 382 of the Code of Civil Procedure, and seeks certification of the following class:

**California Class:**
All persons in California who purchased one or more Products during the Class Period.

CLASS ACTION COMPLAINT

Exhibit A
Page 032

87.    The California Class is referred to as the "Class." Excluded from the Class are the Defendant, the officers and directors of the Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest.  Also excluded from the Class are persons who purchased the Products for purposes of resale.

88.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date of entry of judgment.[37]

89.    Plaintiff reserves the right to expand, limit, modify, or amend the class definition stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

90.    **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiff alleges that there are in excess of 5,000 members of the Class.

91.    **Typicality.** Plaintiff's claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendant's course of conduct as described herein.

92.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff has retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiff and counsel intend to diligently prosecute this action.

93.    **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not

---

[37] The Class Period begins at minimum 4 years from the date of filing of this action, but based on tolling, may extend beyond that date.

CLASS ACTION COMPLAINT

Exhibit A
Page 033

vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

a. Whether the Defendant manufactured, distributed, advertised, marketed, and/or sold the Products.

b. Whether the Products contain or risk containing dangerous levels of lead or mercury.

c. Whether Defendant knew or should have known the Products contained or risked containing dangerous levels of lead or mercury.

d. Whether a reasonable consumer would consider the presence of the heavy metals described herein to be material.

e. Whether Defendant misrepresented the Products to be of a particular standard or quality.

f. Whether Defendant intended not to sell, manufacture, or distribute the Products as advertised and labeled.

g. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

h. Whether Defendant breached implied warranties under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, et seq. ("Song-Beverly Act").

i. Whether Defendant engaged in "unlawful," "unfair," or "fraudulent" business acts or practices in violation of the California Unfair Competition Law under Business & Professions Code § 17200, et seq.

j. Whether Defendant engaged in unfair or deceptive business practices in violation of the California Consumers Legal Remedies Act, Business & Professions Code § 1750, et seq.

k. Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class.

l. Whether Defendant intentionally or recklessly omitted and/or failed to disclose or warn that the Products contain or risk containing the unsafe heavy metals described herein.

m. Whether Defendant concealed that Products contain or risk containing the unsafe heavy metals described herein.

21

Exhibit A
Page 034

n.  Whether the presence of the unsafe heavy metals described herein render the Products adulterated or misbranded.

o.  Whether Plaintiff and the Class are entitled to restitution and disgorgement from Defendant.

p.  Whether injunctive relief is appropriate and necessary to enjoin Defendant from continuing to supply the Products as manufactured and advertised.

94.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

95.    **Substantial Similarity.** On information and belief, the Products at issue in the action are substantially similar in all material respects. Namely, the Products consist of the same or similar ingredients and source materials, contain or risk containing the same or similar levels of heavy metals, are manufactured using the same or similar raw inputs, and are produced using the same or similar manufacturing processes. Additionally, the Products' labeling and advertising all misrepresent the Products as safe for ordinary and regular use, and fail to disclose that the Products contain (or risk

1  containing) dangerous levels of heavy metals. The Products are also all sold, manufactured, distributed

2  or otherwise supplied by Defendant.

3  **VI.    TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY**

4        96.    All applicable statutes of limitations have been tolled by the delayed discovery doctrine.

5  Plaintiff and Class Members could not have reasonably discovered Defendant's practice of introducing

6  Products latent with disease- and cancer-causing substances at unsafe levels into the marketplace, at any

7  time prior to commencing this class action litigation.

8        97.    A reasonable consumer purchasing Defendant's Products would simply believe that the

9  Products are free of unsafe levels of heavy metals linked to cancers and diseases. Nothing in Defendant's

10  marketing or advertising of the Products would lead a reasonable consumer to suspect the existence or

11  potential existence of carcinogenic or toxic ingredients, let alone at dangerous levels.

12        98.    No reasonable consumer could have independently discovered that Defendant's Products

13  are latent with carcinogens and health-deteriorating toxins, including at dangerous levels. Like Plaintiff,

14  the reasonable consumer does not have access to sophisticated scientific resources, nor is the reasonable

15  consumer trained to test the Products for chemical contamination and evaluate their comparative safety.

16  Relying on Defendant's representations of the quality and characteristics of the Products as safe for

17  ordinary use, Plaintiff nor any reasonable consumer knew such scientific testing was needed.

18        99.    Plaintiff did not learn of the presence or potential presence of heavy metals as alleged

19  herein until shortly before commencing this action.

20        100.    As a result, any and all applicable statutes of limitations otherwise applicable to the

21  allegations herein have been tolled.

**FIRST CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (UCL)**

**(Cal. Bus. & Prof. Code §§ 17200, et seq.)**

**(On Behalf of the California Class)**

26        101.    Plaintiff restates the preceding allegations as if set forth herein.

23

CLASS ACTION COMPLAINT

102.    California Business and Professions Code section 17200 et seq., known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unfair or fraudulent business act or practice" as well as "unfair, deceptive, untrue or misleading advertising."

**Fraudulent**

103.    Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

104.    Reasonable consumers are likely to be deceived by Defendant's conduct as alleged above.

105.    As detailed above, the representations on labeling and in advertising, taken individually and collectively, lead reasonable consumers to believe that the Products (1) are safe to use regularly, (2) are beneficial to health and hygiene, and (3) do not contain or risk containing unsafe levels of dangerous heavy metals like lead and mercury.

106.    Statements like "safe to swallow," "no artificial sweeteners," "Build good oral care habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "no artificial sweeteners," "no dyes," "no parabens," and "no titanium dioxide," plus a description of the product as toothpaste, a "kids toothpaste," or for "kids all ages," taken individually and collectively, all lead reasonable consumers to believe that the Products are safe for regular use and do not contain or risk containing unsafe levels of toxins.

107.    In truth, the Products are unsafe because they contain or risk containing unsafe levels of heavy metals and therefore are of an inferior quality and trustworthiness.

108.    Defendant also omitted and failed to disclose material information. Specifically, Defendant failed to disclose that the Products contain or risk containing unsafe levels of heavy metals. As explained above, this is a material safety hazard and concerns the Products' central functionality. Defendant could have and should have prominently disclosed the omitted information on labeling and point-of-sale advertising. Had Defendant disclosed the omitted information, Plaintiff and reasonable consumers would have been aware of it.

109.    Absent Defendant's misrepresentations, Plaintiff and the Class would not have purchased the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the

Exhibit A
Page 037

1  Products as they ultimately did. Plaintiff and the Class's reliance was a substantial factor in causing them

2  harm.

3      110.    Had the omitted information been disclosed, Plaintiff and the Class would have been

4  aware of it and reasonably would have behaved differently. Among other things, they would not have

5  purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much

6  for the items as they did.

7      111.    As a result of Defendant's fraudulent business acts and practices, Defendant has and

8  continues to fraudulently obtain money from Plaintiff and members of the Class.

9  *Unfairness*

10      112.    Under the UCL, a business act or practice is "unfair" if its conduct is substantially

11  injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous,

12  as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the

13  alleged victims.

14      113.    Defendant's deceptive marketing gave consumers the false impression that its Products

15  were safe and healthy for ordinary use and induced consumer purchase.

16      114.    Defendant's conduct was and continues to be of no benefit to reasonable consumers. It is

17  misleading, unfair, unlawful, and is injurious to consumers. It is also against public policy, as it harms

18  fair competition. For example, the federal Lanham Act includes prohibitions on "commercial advertising

19  or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her

20  or another person's goods, services, or commercial activities." 41 U.S.C. § 1125(a). Defendant is

21  siphoning sales away from sellers, manufacturers, and distributors who compete fairly and do not

22  materially misrepresent their Products to consumers. Further, there is no benefit to consumers who pay

23  for Defendant's Products containing (or risk containing) unsafe levels of heavy metals.

24      115.    The harm to Plaintiff and members of the Class outweighs the utility of Defendant's

25  practices. There were reasonably available alternatives to further Defendant's legitimate business

26  interests, other than the unfair conduct described herein. Indeed, Defendant could have removed the

27  unsafe levels of heavy metals from the Products during the manufacturing process, or could have used

28  different raw materials.

Exhibit A
Page 038

116.    As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiff and members of the proposed Class.

*Unlawful*

117.    A cause of action may be brought under the "unlawful" prong of the UCL if a practice violates another law. Such action borrows violations of other laws and treats these violations as unlawful practices independently actionable under the UCL.

118.    By injecting into the stream of commerce Products containing or at risk of containing heavy metals, and making material misrepresentations/omissions about the Products, as alleged above, Defendant engaged in unlawful business acts and practices in violation of the UCL, including violations of state and federal laws and regulations. As described herein, Defendant violated state and federal including (1) the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq.; (2) the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 et seq; (3) the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.; (4) the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.; and (5) the Song-Beverly Act, Cal. Civ. Code §§ 1790, et seq.

119.    Plaintiff, on behalf of himself and the members of the Class, seeks restitution and restitutionary disgorgement of all moneys received by Defendant through the conduct described above.

120.    Plaintiff, on behalf of himself and the members of the Class, seeks an injunction from this Court prohibiting Defendant from engaging in the patterns and practices described herein, including putting a stop to the misleading representations/omissions about the Products and the sale, manufacturing, or distribution of the Products containing or at risk of containing the levels of heavy metals alleged in this Complaint. Plaintiff and Class Members are entitled to injunctive relief. On information and belief, the dissemination of Defendant's Products are ongoing.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CLRA)

### (Cal. Civ. Code §§ 1750, et seq.)

### (On Behalf of the California Class)

121.    Plaintiff restates the preceding allegations as if set forth herein.

CLASS ACTION COMPLAINT

Exhibit A
Page 039

122.    The CLRA prohibits deceptive practices concerning the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

123.    Plaintiff and California Class Members are "consumers" as defined by Civil Code § 1761(d).

124.    Defendant is a "person" as defined by Civil Code § 1761(c).

125.    The Products qualify as "goods" as defined by Civil Code § 1761(a).

126.    Plaintiff and the Class Members' purchase of the Products are "transactions" as defined by Civil Code § 1761(e).

127.    The CLRA deems the following "unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer" as unlawful.

(a)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

(b)    "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

(c)    "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

(d)    "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

128.    Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Products had characteristics that they did not actually have and were of a quality that they are not.

129.    As detailed above, the representations on labeling and in advertising, taken individually and collectively, lead reasonable consumers to believe the Products (1) are safe to use regularly, (2) are

27

Exhibit A
Page 040

1    beneficial to health and hygiene, and (3) do not contain or risk containing unsafe levels of dangerous

2    heavy metals like lead and mercury..

3        130.    Statements like "safe to swallow," "no artificial sweeteners," "Build good oral care

4    habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "no

5    artificial sweeteners," "no dyes," "no parabens," and "no titanium dioxide," plus a description of the

6    product as toothpaste, a "kids toothpaste," or for "kids all ages," taken individually and collectively, all

7    lead reasonable consumers to believe that the Products are safe for regular use and do not contain or risk

8    containing unsafe levels of toxins.

9        131.    In truth, the Products are unsafe because they contain or risk containing unsafe levels of

10   heavy metals and therefore are of an inferior quality and trustworthiness.

11       132.    Defendant also omitted and failed to disclose material information. Specifically,

12   Defendant failed to disclose that the Products contain or risk containing unsafe levels of heavy metals.

13   As explained above, this is a material safety hazard and concerns the Products' central functionality.

14   Defendant could have and should have prominently disclosed the omitted information on labeling and

15   point-of-sale advertising. Had Defendant disclosed the omitted information, Plaintiff and reasonable

16   consumers would have been aware of it.

17       133.    Absent Defendant's misrepresentations, Plaintiff and the Class would not have purchased

18   the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the

19   Products as they ultimately did. Plaintiff and the Class's reliance was a substantial factor in causing them

20   harm.

21       134.    Had the omitted information been disclosed, Plaintiff and the Class would have been

22   aware of it and reasonably would have behaved differently. Among other things, they would not have

23   purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much

24   for the items as they did.

25       135.    As a result of Defendant's fraudulent business acts and practices, Defendant has and

26   continues to fraudulently obtain money from Plaintiff and members of the Class.

27       136.    Plaintiff, through counsel, is providing notice to Defendant pursuant to Cal. Civ. Code §

28   1782(a) via certified mail. As such, Plaintiff claims no damages pursuant to this count, but will timely

CLASS ACTION COMPLAINT

Exhibit A
Page 041

1  amend this Complaint after expiration of the response period to seek money damages and punitive

2  damages under the CLRA.  At this time, Plaintiff seeks only injunctive or other equitable relief under the

3  CLRA as described above.

### THIRD CAUSE OF ACTION

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE SONG-**

**BEVERLY ACT**

**(Cal. Civ. Code § 1790, et seq.)**

**(On Behalf of Plaintiff and the California Class)**

137.    Plaintiff restates the preceding allegations as if set forth herein.

138.    Under the Song-Beverly Act, Cal. Civ. Code § 1790. et seq., every sale of consumer goods
in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty
that the goods are merchantable, as defined in the Act.

139.    The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code §
1791(a).

140.    Plaintiff and the Class Members who purchased the Products are "retail buyers" within
the meaning of Cal. Civ. Code § 1791.

141.    Defendant is in the business of manufacturing and/or producing the Products and therefore
is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

142.    Defendant impliedly warranted to retailer buyers that Products were merchantable and
that it would: (a) pass without objection in the trade or industry under the contract description, (b) were
fit for the ordinary purposes for which the Products are used, (c) were adequately contained, packaged,
and labeled, and (d) conformed to the promises or affirmation of fact made on the container or label. Cal.
Civ. Code § 1791.1(a).

143.    Defendant breached these implied warranties as described above. The Products were
unsafe for their ordinary use: Plaintiff and the Class place the Products in their mouths and their children's
mouths to cleanse and maintain oral hygiene. Because the Products contain unsafe levels of heavy metals,
the Products are unfit to be used as toothpastes. For the same reasons, the Products would not pass without
objection in the trade or industry—reasonable manufacturers and sellers of toothpaste ensure that unsafe

Exhibit A
Page 042

levels of heavy metals are not present in finished products (or fully disclose that risk). Likewise, the Products were not adequately labeled and do not conform to the promises on labeling. As explained above, the Products are represented as safe to use when in truth they are not.

144.    The Products were defective at the time of sale. The issue as described in this Complaint was latent in the Products and not discoverable at the time of sale. Though the Products appear usable when new, the safety defect existed at the time of sale and throughout the one-year period under the Song-Beverly Act. Accordingly, any subsequent discovery of the safety defect by Class Members beyond that time does not bar an implied warranty claim under the Song-Beverly Act.

145.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

146.    As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products (or at minimum would have paid much less) if they knew the truth, namely, that the Products were unfit for ordinary use and posed a significant health and safety risk.

147.    Plaintiff and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## FOURTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

### (On Behalf of the California Class)

148.    Plaintiff restates the preceding allegations as if set forth herein.

149.    For the children's Products, Defendant issued an express warranty on the Products' labeling and advertising that the Products are (1) either safe for "kids all ages" or "kids age 2+," and (2) "safe to swallow."

150.    Defendant breached this express warranty because, as explained above, the Products contain or risk containing unsafe levels of heavy metals thus rendering the products unsafe for kids and unsafe to swallow.

Exhibit A
Page 043

151.     Defendant's affirmation of fact made to Plaintiff and the Class became a part of the basis of the bargain, thereby creating warranties that the Products would conform to Defendant's affirmations of fact.

152.     Plaintiff and the Class were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they had known the true facts, or would have paid less for the Products, and the Products did not have the quality, effectiveness, or value as promised.

153.     As a result, Plaintiff and the Class have been damaged in the full amount of the purchase price of the Products, or at minimum a portion of the purchase price of the Products.

### FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT/QUASI-CONTRACT

### (On Behalf of the California Class)

154.     Plaintiff restates the preceding allegations as if set forth herein.

155.     Plaintiff pleads this claim under California law and in the alternative to his remaining claims.

156.     California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim. *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 756 (9th Cir. 2015).

157.     California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020).

158.     California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.

159.     Under California law, a stake in unjustly earned profits exists regardless of the plaintiff's actual loss.

160.     By its wrongful acts and omissions, Defendant was unjustly enriched at the expense of and to the detriment of Plaintiff and the Class and/or while Plaintiff and the Class were unjustly deprived. Defendant's unlawful and deceptive misrepresentations and omissions induced Plaintiff and the Class to

31

Exhibit A
Page 044

1    spend money they otherwise would not have spent, purchase items they otherwise would not have

2    purchased, and/or spend more money for a product than they otherwise would have absent such unlawful

3    practices.

4        161.    Plaintiff and members of the Class also conferred a monetary benefit on Defendant in the

5    form of Defendant's profits generated by the deceptive misrepresentations and omissions. Defendant

6    profited from making false representations and omissions of material fact.

7        162.    On behalf of the Class, Plaintiff seeks restitution from Defendant and an order disgorging

8    all payments and profits obtained by Defendant from Plaintiff and the Class.

9                            **PRAYER FOR RELIEF**

10       WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for

11   following relief:

12       a.   Certification of this case as a class action on behalf of the proposed Class and any

13            subclasses defined above, appointment of Plaintiff as Class representative, and

14            appointment of counsel as Class counsel;

15       b.   An award to Plaintiff and the proposed Class and subclasses of restitution and/or other

16            equitable relief, including, without limitation, restitutionary disgorgement of all profits

17            Defendant obtained from Plaintiff and the proposed Class as a result of its unlawful, unfair

18            and fraudulent business practices described herein;

19       c.   An injunction ordering Defendant to cease the manufacturing, distribution, and sale of the

20            dangerous Products complained of herein, and to correct its misrepresentations/omissions;

21       d.   An award of all economic, monetary, actual, consequential, and compensatory damages

22            caused by Defendant's conduct where available;

23       e.   An award of nominal, punitive, and statutory damages where available;

24       f.   Reasonable expenses and attorneys' fees where available;

25       g.   Pre- and post-judgment interest, to the extent allowable; and

26       h.   For such further relief that the Court may deem just and proper.

27

28

CLASS ACTION COMPLAINT

Exhibit A
Page 045

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all claims so triable.

Dated: May 16, 2025

MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC

By: */s/ Alexander E. Wolf*

ALEXANDER E. WOLF
Attorneys for Plaintiff

Exhibit A
Page 046