ALEXANDER E. WOLF (SBN 299775)
awolf@milberg.com
JOHN J. NELSON (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872-365-7060

WILLIAM J. EDELMAN (SBN 285177)
wedelman@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: 771-474-1121

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

TAL NELKIN and CHRISTINE PRADO, individually and on behalf of all similarly situated persons,

Plaintiffs,

v.

COLGATE-PALMOLIVE COMPANY, individually and as successor-in-interest to HELLO PRODUCTS LLC, a Delaware corporation,

Defendant.

Case No. 2:25-cv-06770-FLA-PD

**FIRST AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Tal Nelkin and Christine Prado ("Plaintiffs"), on behalf of themselves and of all others similarly situated ("Class" or "Class Members"), bring this class action complaint against Defendant Colgate-Palmolive Company, individually and as successor in interest to Hello Products LLC ("Defendant"). The allegations asserted herein are based on Plaintiffs' personal knowledge of facts pertaining to themselves and upon information and belief, including further investigation conducted by Plaintiffs' counsel, as to the remainder.

## I. NATURE OF THE ACTION.

1. Plaintiffs respectfully commence this class action to stop Defendant's deceptive business practice of marketing and selling its toothpaste products which contain or risk containing significant levels of heavy metals like lead and mercury, despite affirmatively mispresenting otherwise. The products at issue are all of Defendant's Hello-branded toothpastes, including without limitation Hello Fluoride Free Toothpaste Fresh Watermelon, Hello Fluoride Toothpaste Dragon Dazzle, Hello Smiling Shark Fluoride Free Kids Toothpaste, Hello Kids Unicorn Sparkle Bubble Fluoride Toothpaste, and Hello Vitamin C Whitening Toothpaste (the "Products").

2. Defendant is a manufacturer and seller of toothpaste. Plaintiffs are one of many consumers who purchased toothpaste for regular and ordinary use.

3. Prior to placing the Products into the stream of commerce and the hands of consumers to use on themselves and their children, Defendant knew the Products contained or risked containing significant levels of lead and/or mercury. Yet Defendant omitted this information on packaging and failed to warn about the significant presence or risk of presence of dangerous heavy metals, despite advertising the Products to the contrary.

4. Plaintiffs and Class Members reasonably relied on Defendant's representations and partial omissions which led them to believe the Products were without detectable levels of heavy metals, let alone significant or unsafe levels.

5. Plaintiffs and Class Members purchased and/or used the Products and were therefore exposed to, or risked being exposed to, heavy metals linked to adverse health conditions.

6. The heavy metals are avoidable constituents in the Products and Defendant's manufacturing process.

7. Defendant is therefore liable to Plaintiffs and Class Members for selling, advertising, manufacturing, and distributing the Products with affirmative misrepresentations and without conspicuously disclosing that the Products contain or risk containing significant or unsafe levels of heavy metals.

## II. PARTIES.

8. Plaintiff Tal Nelkin is, and at all times relevant to this action was, a resident of Los Angeles County, California. Plaintiff therefore is a citizen/domiciliary of California.

9. Plaintiff Christine Prado is, and at all times relevant to this action was, a resident of Los Angeles County, California. Plaintiff therefore is a citizen/domiciliary of California.

10. Defendant Colgate-Palmolive Company is, and at all times relevant to this action was, a Delaware corporation with its principal place of business at 300 Park Avenue, New York, NY 1002. Hello Products LLC formerly was a wholly owned subsidiary of Defendant. Hello Products LLC was a Delaware limited liability company with its principal place of business in Montclair, New Jersey. In September 2024, Hello Products LLC was dissolved with all its assets and liabilities assigned to Colgate-Palmolive Company. Thus, Defendant is a citizen of Delaware and New York. Defendant sells, manufactures, and/or distributes the Products.

## III. JURISDICTION AND VENUE.

11. This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000,

exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this judicial district. Defendant markets and sells the products to consumers in this district, including at least one plaintiff.

13. Further, as set forth herein, Defendant has contacts in this forum sufficient to subject it to personal jurisdiction. Defendant continuously and systematically places goods into the stream of commerce for distribution in California, offers to ship products to California, markets the Products to persons in California, and manufactures and supplies the Products to third-party sellers to sell to consumers in California. Exercising jurisdiction over Defendant is fair, just, and reasonable considering the quality and nature of Defendant's acts that occur in California, and which affect interests located in California. Defendant has purposefully availed itself of the privilege of conducting activities in California, and should reasonably anticipate being haled into court in California.

## IV. FACTUAL ALLEGATIONS.

### A. Defendant is a Prominent, Knowledgeable, and Experienced Manufacturer and Seller of Toothpaste.

14. Toothpaste is a hygiene product used daily. Its purpose is simple—to promote and maintain oral hygiene. For example, toothpaste aids in removing dental plaque and food from the teeth, assists in suppressing halitosis, and helps prevent tooth decay (dental caries) and gum disease (gingivitis).

15. Defendant is among the leading health-conscious and eco-friendly toothpaste brands in the United States. On information and belief, sales of Hello-brand toothpaste in California alone total tens of millions per year.

16. Defendant prides itself as a major and influential player in the toothpaste market. According to Defendant's "About Us" webpage, Defendant states it makes

"friendly products" and "we believe it's high time oral and personal care got a whole lot more friendly for you and your family. hello makes products that are relevant. beautiful. welcoming. and good-for-you."[1]

17. Defendant states its goal is "making the world a friendlier place, starting with your mouth [¶] hello is a new kind of friendly personal care, created by a small, entrepreneurial crew using thoughtful ingredients so delicious you'll rush to brush. for reals."[2]

18. Defendant touts itself as experienced, knowledgeable, and a pioneer in the tooth space market, including: "hello is a new kind of friendly personal care"; "delicious, natural flavors that taste awesome af."; "our products work great and are free from artificial sweeteners, dyes, flavors, and parabens."; "we love people, the planet, and design. that's why hello is pretty."; "our products mirror our values, aiming for a happier world with more smiles."; and "not tested on animals."[3]

**B. Independent Study Recently Uncovers Dangerous Levels of Lead and Mercury in the Products.**

19. Lead Safe Mama LLC ("Lead Safe Mama") is a consumer safety organization and advocate that conducts "independent, community-funded, scientific testing of consumer goods."[4]

20. Lead Safe Mama recently tested various toothpastes widely available in the marketplace, including certain Hello-brand toothpaste. The findings were published in early 2025.[5]

---

[1] https://www.hello-products.com/pages/about-us

[2] *Id.*

[3] *Id.*

[4] Lead Safe Mama, *Chart Comparing the Toxicant Profiles of Popular Toothpaste and Tooth Powder Products Tested by an Independent, Third-Party Lab in 2025*, available at https://tamararubin.com/2025/01/toothpaste-chart (hereinafter, the "**Lead Safe Mama Chart.**")

[5] *Id.*

21. Lead Safe Mama specifically tested two of the Products—Hello Kids Fluoride Free Toothpaste Fresh Watermelon and Hello Kids Fluoride Toothpaste Dragon Dazzle—which showed the Products contained alarmingly high levels of lead and mercury. The testing was performed by independent laboratories (Purity Laboratories Inc. and SimpleLab Inc.) using Inductively Coupled Plasma Mass Spectrometry (ICP-MS) testing methodology.

a. The Hello Kids Fluoride Free Toothpaste Fresh Watermelon tested for 493 ppb (parts per billion) of lead and 19 ppb of mercury.[6] Testing was performed on January 27, 2025.

b. The Hello Kids Fluoride Toothpaste Dragon Dazzle tested for 428.4 ppb of lead and 11.8 ppb of mercury.[7] Testing was performed on March 12, 2025.

22. Plaintiffs' counsel independently tested additional Hello Toothpaste Products with similar results. Testing was performed by an independent laboratory, ISO/IEC 17025 accredited, using the ICP-MS testing methodology. The Products with Lot #s were purchased from Target.com on July 9, 2025. The used Products were privately purchased, and Lot #s are no longer available. Results are described below.

a. Hello Smiling Shark Kids Fluoride Free Fruit Punch (Lot # 5085 US 3020)
   i. 336.5 ppb lead
   ii. 4.0 ppb mercury
   iii. 0.7 ppb cadmium
b. Hello Smiling Shark Kids Fluoride Free Fruit Punch (Lot # 5085 US 3020)
   i. 419.0 ppb lead
   ii. 5.7 ppb mercury
   iii. 2.4 ppb cadmium

---

6 https://tamararubin.com/2025/01/hello-fresh-watermelon-natural-flavor-fluoride-free-toothpaste/

7 https://tamararubin.com/2025/04/hello-brand-dragon-dazzle-fluoride-toothpaste-for-children/

c. Hello Dragon Dazzle Fluoride Blue Raspberry (Lot # 4243 US 2808)
   i. 327.1 ppb lead
d. Hello Dragon Dazzle Fluoride Blue Raspberry (used product)
   i. 364.4 ppb lead
   ii. 8.5 ppb mercury
   iii. 1.1 ppb cadmium
e. Hello Unicorn Sparkle Fluoride Bubble Gum (Lot # 5034 US 2808)
   i. 235.7 ppb lead
   ii. 5.4 ppb mercury
   iii. 1.2 ppb cadmium
f. Hello Vitamin C Whitening Natural Peppermint (used product)
   i. 441.3 ppb lead
   ii. 12.3 ppb mercury
   iii. 2.2 ppb cadmium

**C. Exposure to Heavy Metals from the Products is Hazardous.**

23. Heavy metals bioaccumulate in the body. This means the body cannot excrete and expel toxins as quickly as they are absorbed, so the amount present in the body—along with the associated negative health risks—grows over time.[8]

24. The U.S. Food and Drug Administration ("FDA") and World Health Organization ("WHO") have declared heavy metals "dangerous to human health."[9]

---

[8] Jesse Hirsch, *Heavy Metals in Baby Food: What You Need to Know*, Consumer Reports (June 27, 2023), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

[9] *Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, U.S. House of Representatives Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Feb. 4, 2021 ("House Report") at 2, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.

25. For example, exposure to heavy metals puts children at risk for diminished mental capacity, behavioral problems (like attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues.

26. Heavy metals also pose health risks to adults. Even modest amounts of ingested heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions. These facts underscore the importance of limiting heavy metal exposure and consumption.

27. It is particularly important to limit or eliminate heavy metals from household products that are used daily and potentially ingested, like toothpaste.

**1. Lead.**

28. Lead in adults can suppress the immune system and cause hypertension,[10] plus "kidney damage, cardiovascular problems, reproductive damage, and brain damage, and in children can lead to brain and nervous system damage, learning disabilities, behavioral problems, and developmental delays."[11]

29. Lead exposure can seriously harm the brain and nervous system and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. Lead exposure can also lead to cancer.

30. Children are at especially high risk of developing adverse effects from lead exposure due to their developing brains, and because, compared to adults, less lead is stored by the body in bones and teeth and more in the nervous system.[12]

---

[10] *Lead Poisoning*, World Health Organization (Sep. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[11] Karen Feldscher, *Synthetic Braiding Hair Used by Black Women Contain Dangerous Chemicals*, Harvard T.H. Chan School of Public Health (Mar. 5, 2025), available at https://hsph.harvard.edu/news/synthetic-braiding-hair-used-by-black-women-contain-dangerous-chemicals/.

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1314903

31. No amount of lead is safe for human exposure or consumption. Indeed, according to the FDA, CDC, and WHO, there is no "safe" level of lead in blood.[13]

32. According to the CDC, "Testing products in a laboratory is the only way to tell for certain if the product contains lead. It is best to avoid the use of products that may contain lead."[14]

33. As noted above, bodily exposure to lead builds up over time. Buildup has been clinically shown to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, in addition to serious injuries to the nervous system, organs, and body systems.

34. "Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time."[15]

35. Of note, "[r]epeated low-level exposure [to lead] over a prolonged period" can result in "chronic poisoning" and adverse symptoms including "persistent vomiting, encephalopathy, lethargy, delirium, and coma."[16] This has occurred when blood lead levels

---

[13] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016), available at https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health ("No amount of lead is known to be safe."); *Lead in Food and Foodwares*, FDA, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last updated Jan. 6, 2025); *About Childhood Lead Poisoning Prevention*, Centers for Disease Control and Prevention (Mar. 13, 2025), available at https://www.cdc.gov/lead-prevention/about/index.html?CDC_AAref_Val=https://www.cdc.gov/nceh/lead/prevention/healtheffects.html ("There are no safe levels of lead in the blood.") (last visited Apr. 25, 2025).

[14] *About Lead in Foods, Cosmetics, and Medicines*, Centers for Disease Control and Prevention (Sep. 24, 2024), https://www.cdc.gov/lead-prevention/prevention/foods-cosmetics-medicines.html.

[15] https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf at 49.

[16] Bhasin, T. et al., *Unveiling the Health Ramifications of Lead Poisoning: A Narrative Review* (Oct. 9, 2023), available at https://www.cureus.com/articles/184381-unveiling-the-health-ramifications-of-lead-poisoning-a-narrative-review#!/.

reach 40 to 60 µg/dl.[17] Moreover, "Elevated levels of lead exposure have been consistently associated with a range of kidney abnormalities, even when lead concentrations are relatively modest, such as around 10 µg/dl."[18] And, for context, 1 µg/dl equates to .01 ppm (parts per million) or 10 ppb (parts per billion).[19]

36. In short, lead is extremely toxic even at low levels, and especially so over an extended time. So, lead should be avoided.

**2. Mercury.**

37. "Mercury is a naturally-occurring chemical element found in rock in the earth's crust, including in deposits of coal."[20] "In its inorganic form, mercury occurs abundantly in the environment, primarily as the minerals cinnabar and metacinnabar, and as impurities in other minerals."[21]

38. "Mercury exposure at high levels can harm the brain, heart, kidneys, lungs, and immune system of people of all ages. High levels of methylmercury in the bloodstream of babies developing in the womb and young children may harm their developing nervous systems, affecting their ability to think and learn."[22]

39. "High exposure to inorganic mercury may result in damage to the gastrointestinal tract, the nervous system, and the kidneys."[23] "Both inorganic and organic mercury are absorbed through the gastrointestinal tract and affect other systems through

---

[17] *Id.*

[18] *Id.*

[19] https://www.endmemo.com/concentration_solution/microgram_deciliterpartpermillion.html.

[20] https://www.epa.gov/mercury/basic-information-about-mercury.

[21] *Id.*

[22] *Id.*

[23] https://www.epa.gov/mercury/health-effects-exposures-mercury

this route."[24] "Symptoms of high exposures to inorganic mercury include: skin rashes and dermatitis; mood swings; memory loss; mental disturbances; and/or muscle weakness."[25]

40. Importantly, "exposure to mercury – even in small amounts – may cause serious health problems, and is a threat to the development of the child in utero and early in life."[26] For example, "Mild, subclinical signs of central nervous system toxicity can be seen in workers exposed to an elemental mercury level in the air of 20 μg/m3 or more for several years. Kidney effects have been reported, ranging from increased protein in the urine to kidney failure."[27]

41. Stated differently, mercury "even at low concentrations . . . can have harmful long-term health effects, causing headaches, limb pain, tooth loss, or general weakness."[28] So, mercury should be avoided.

### D. The Levels of Heavy Metals in the Products are Significant and Dangerous.

42. According to the U.S. Environmental Protection Agency ("EPA"), Maximum Contaminant Level Goals ("MCLG") are "non-enforceable health goals" based on "possible health risks."[29] The EPA also sets "an enforceable regulation called a maximum contaminant level (MCL) based on the MCLG. MCLs are set as close to the MCLGs as

---

[24] *Id.*

[25] *Id.*

[26] World Health Organization, *Mercury and Health*, available at https://www.who.int/news-room/fact-sheets/detail/mercury-and-health.

[27] *Id.*

[28] Charkiewicz et al., *Mercury Exposure and Health Effects: What Do We Really Know?*, Int'l Journal of Molecular Science (Mar. 5, 2025), available at https://www.mdpi.com/1422-0067/26/5/2326.

[29] Basic Information about Lead in Drinking Water, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last updated May 22, 2025).

possible, considering cost, benefits and the ability of public water systems to detect and remove contaminants using suitable treatment technologies."[30]

43. For drinking water, the EPA set the MCLG for lead at zero, and the action level[31] at 0.015 mg/L (equivalent to 0.01 ppm or 10 ppb).[32] The "EPA has set this level based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[33]

44. For inorganic mercury in drinking water, the EPA set both the MCLG and MCL to 0.002 mg/L (equivalent to 0.002 ppm or 2 ppb).[34] But there is no safe level. "Mercury is a highly toxic element; there is no known safe level of exposure. Ideally, neither children nor adults should have *any* mercury in their bodies because it provides no physiological benefit."[35]

45. The levels of lead and mercury in the Products far exceed these thresholds many times over. For example:

a. The 493 ppb of lead in Hello Kids Fluoride Free Toothpaste Fresh Watermelon tested by Lead Safe Mama is 32 times the EPA's action level, and the 19 ppb of mercury is 9 times the EPA's MCL level.

---

[30] *Id.*

[31] In lieu of a formal MCL for lead, the EPA established a "Treatment Technique" action level. *See* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

[32] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations

[33] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water

[34] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations.

[35] https://pmc.ncbi.nlm.nih.gov/articles/PMC3096006/#:~:text=Acute%20or%20chronic%20mercury%20exposure,it%20provides%20no%20physiological%20benefit.

b. The 428.4 ppb of lead in Hello Kids Fluoride Toothpaste Dragon Dazzle tested by Lead Safe Mama is 28 times the EPA's action level, and the 11.8 ppb of mercury is over 5 times the EPA's MCL level.

46. This especially concerning because toothpaste is often swallowed and absorbed sublingually by children, and potentially adults.

**E. Toothpaste Can Be Manufactured Without Detectable Lead and Mercury.**

47. Based on present day manufacturing capabilities, toothpaste can be manufactured without detectable levels of lead and mercury in finished products.

48. To that end, according to Lead Safe Mama, competing toothpaste brands have manufactured toothpaste with non-detectable levels (less than 5 ppb and likely zero) of lead and mercury.[36] These include:

a. Essential Oxygen Fluoride-Free BR Certified Organic in Peppermint Flavor

b. Orajel Kids Training Toothpaste in Natural Berry Fruity Flavor, Elmo Sesame Street Packaging, Fluoride-free

c. Miessence Mint Toothpaste, Fluoride Free

d. Dr. Brown's Fluoride-free Baby Toothpaste in Strawberry Flavor

e. Pegciz Kids Foam Toothpaste (Low Fluoride) in Watermelon Flavor

f. Kid's Spry Tooth Gel with Xylitol in Original Flavor

49. Accordingly, the reasonable consumer's expectations described herein are in fact reasonable and do not set an impossible standard.

---

[36] e.

**F. Reasonable Consumers are Deceived by Defendant's Misrepresentations and Believed The Products Did Not Contain or Risk Containing Detectable, Significant, and Unsafe Levels of Heavy Metals.**

50. Defendant's Products should not have contained (or risk containing) detectable levels of heavy metals, let alone significant levels or unsafe levels, based on the Products' labeling and advertising.

51. As explained above, Defendant positions itself and its brand as trustworthy, safe, and responsible to consumers. Defendant's advertising and labeling is designed to reinforce this message. To that end, exemplars of the Products' packaging and advertising (collected from publicly available sources) are shown below.

**<u>Hello Kids Fluoride Free Toothpaste for Kids All Ages - Watermelon</u>**



**Product Description**

Say hello to a naturally friendly fluoride free kids toothpaste that tastes so delish they'll lose their rind with Hello Watermelon Kid Toothpaste. This 3 pack of watermelon flavored Hello kids toothpaste is thoughtfully formulated with high quality ingredients like xylitol and erythritol, soothing aloe and a silica blend that gently polishes and brightens teeth. Plus, this toothpaste for kids removes plaque, because let's face it, we're friendly, but plaque? Not so much. Best of all, this toddler toothpaste and baby toothpaste is safe to swallow for little ones still learning to brush and it's formulated without mint so kids can say goodbye to spicy, and hello to natural flavors that'll make them smile wide. Hello contains no artificial sweeteners, no artificial flavors, no dyes, no microbeads, no parabens, no SLS and no gluten. Hello is also vegan, not tested on animals (Leaping Bunny Certified and PETA recognized), and made in the USA. Choose friendly, brush happy.

*Images dated May 15, 2025 (Amazon.com)*




Hello Natural Watermelon Flavor Kids Fluoride Free Toothpaste and Mouthwash, Vegan, Alcohol Free, SLS Free, Gluten Free, 4.2 Ounce Toothpaste Tubes (Pack of 2), 16 Fl Oz Mouthwash Bottle

Visit the hello Store

2,710 ratings | 17 answered questions

Amazon's Choice in Children's Toothpaste by hello

$14.42 ($14.42 / Count)









| | |
|---|---|
| **Brand** | Hello |
| **Flavor** | Watermelon |
| **Age Range (Description)** | Kid |
| **Item Form** | Paste |
| **Material Type Free** | Fluoride Free, Sodium Lauryl Sulfate Free, Bisphenol A Free, Phthalate Free |

## About this item

- Contains two 4.2 ounce tubes of hello kids fluoride free watermelon flavor toothpaste and one 16 ounce bottle of hello kids fluoride free watermelon flavor rinse
- Hello kids fluoride free toothpaste is thoughtfully formulated with high quality ingredients like xylitol, erythritol, soothing aloe vera, and a silica blend that gently polishes teeth
- This fruity mouthwash, with soothing aloe vera and natural sweeteners, rinses away particles brushing may miss, cleans and freshen, and tastes so delicious they'll rush to rinse
- Hello kids fluoride free toothpaste and rinse are free from dyes, SLS, artificial sweeteners and flavors, microbeads, triclosan and gluten; No brainer
- Choose friendly; hello is vegan, never tested on animals (Leaping Bunny Certified) and made in the USA; Brush, rinse and greet freely

*Images dated May 15, 2025 and June 17, 2025 (Amazon.com and Target.com)*

**<u>Hello Kids Fluoride Free Toothpaste for Kids All Ages – Smiling Shark Fruit Punch</u>**









## About this item

- WHAT I'M GETTING: Includes three (3) 4.2 oz tubes of hello Smiling Shark Fluoride Free Kids Toothpaste, Natural Fruit Punch flavored
- SWALLOW SAFE: This magical kids fluoride free toothpaste is safe for all ages and helps remove plaque with regular brushing
- MAGICALLY BRILLIANT: The fintastic Fruit Punch kids toothpaste flavor tastes magical and works brilliantly as a training toothpaste to build good brushing habits
- NO BAD STUFF ALLOWED: This toddler toothpaste is made with no parabens, dyes, titanium dioxide, sugar, artificial sweeteners or artificial flavors, and is gluten free
- FINS UP: Savor the jawsome fruit punch flavor and make a big splash when it's time to brush with hello Smiling Shark Fluoride Free Kids Toothpaste

*Images dated May 15, 2025 (Amazon.com)*

**Hello Kids Fluoride Toothpaste Dragon Dazzle**




**hello Dragon Dazzle Kids Toothpaste with Fluoride, Blue Raspberry Toothpaste, 4.2 Oz Tube**

(4.8) | 276 ratings

**Multipack Quantity:** 1

1
$4.96
$1.18/oz

**About this item**

- WHAT I'M GETTING: Includes one (1) 4.2 oz tube of hello Dragon Dazzle Kids Toothpaste with Fluoride, Blue Raspberry Toothpaste for Kids
- FIGHTS CAVITIES: This kids fluoride toothpaste is safe for children ages 2 and up, helps prevent cavities and strengthens growing teeth using fluoride
- MAGICALLY BRILLIANT: The dragon kid toothpaste tastes like magic and works brilliantly to build good brushing habits and help brush away plaque
- DAZZLING BRIGHT: hello Dragon Dazzle Kids Toothpaste is formulated with natural flavor and high quality ingredients
- NO BAD STUFF: This gluten-free toothpaste is made with no SLS, preservatives, parabens, dyes, spicy mint, artificial sweeteners or flavors
- Child
- Raspberry







*Images dated May 15, 2025 and June 17, 2025 (Walmart.com and Amazon.com)*

Categories Deals New & featured Pickup & delivery What can we help you fi

rget / Personal Care / Oral Care / Toothpaste

nop all hello

## ello Dragon Dazzle Blue Raspberry Fluoride Toothpaste - 4.2oz




### Highlights

- say hello to dragon dazzle fluoride toothpaste that prevents cavities, strengthens enamel, and slays dragon breath.
- dragon dazzle toothpaste polishes and brightens your lil' ones beautiful pearlies and tastes magical
- this toothpaste is thoughtfully formulated with high quality ingredients like xylitol and stevia. this friendly toothpaste is also free from SLS, artificial sweeteners, dyes, artificial flavors, parabens, and gluten.
- hello is vegan and not tested on dragons, or any animals for that matter (leaping bunny certified). choose friendly.

**Description**

this toothpaste is magic. say hello to brush time magic with dragon dazzle toothpaste that tastes like adventure and glory. it works brilliantly, and is thoughtfully formulated with natural flavor, sparkles, and high quality ingredients like xylitol and stevia. this friendly toothpaste helps brush away plaque, slays dragon breath, and polishes and brightens smiles. something else to get fired-up about: it's not tested on dragons, or any animals for that matter. and just when you thought it couldn't get any better, carefully open the carton to find a magical surprise inside for your child. #brushhappy

*Images dated August 21, 2024 (Target.com)*

**<u>Hello Naturally Whitening Fluoride SLS-Free Vegan</u>**



## Details

### Highlights

- What I'm Getting: Includes one (1) 4.7 oz tube of hello Naturally Whitening Fluoride Toothpaste, Mint
- See Ya Stains: Whitens naturally with natural whitening ingredients to remove stains and uses fluoride to help prevent cavities and strengthen enamel
- So Fresh: This naturally whitening toothpaste is formulated with super-peppy peppermint so you can experience mind-blowing freshness
- Only Good Stuff Allowed: This toothpaste is peroxide free, SLS free and has no artificial sweeteners or flavors, dyes, parabens, and titanium dioxide
- Everyday Yay: hello Naturally Whitening Fluoride Toothpaste is a vegan toothpaste and is not tested on animals

## Description

Say hello to an everyday yay whitening toothpaste with mind-blowing freshness with the hello Naturally Whitening Fluoride Toothpaste. This minty whitening toothpaste tastes awesome and works brilliantly with a calcium mineral blend that helps naturally whiten teeth by removing surface stains. It's thoughtfully formulated to tame bad breath and moisturize. Made with high quality ingredients like farm grown super-peppy peppermint, tea tree oil, and coconut oil for extra friendliness, this naturally whitening toothpaste gives you awesome fresh breath. And because it's formulated with fluoride, it also helps prevent pesky cavities and strengthens tooth enamel. hello Naturally Whitening Toothpaste contains no artificial sweeteners, no artificial flavors, no peroxide, no titanium dioxide, no dyes, no SLS, and this mint toothpaste is vegan.

*Images dated August 7, 2025 (Target.com)*

# Hello Super Fresh Fluoride Free Toothpaste Natural Spearmint




## Details

### Highlights

- WHAT I'M GETTING: Includes one (1) 4.7 oz tube of hello Super Fresh Fluoride Free Toothpaste, Natural Spearmint
- UNBELIEVABLE FRESHNESS: This natural spearmint toothpaste whitens naturally while it also helps remove plaque with brushing
- ONLY THE GOOD STUFF ALLOWED: This hello toothpaste is fluoride free and contains no artificial sweeteners, no dyes, no SLS, no-brainer
- EVERYDAY YAY: hello Super Fresh Fluoride Free Toothpaste is a vegan toothpaste and is not tested on animals
- MINTY FRESH: Say hello to a friendly whitening toothpaste for bad breath with hello Super Fresh Natural Spearmint Toothpaste

**Description**

Say hello to a friendly toothpaste for bad breath with hello Super Fresh Natural Spearmint Toothpaste. This fluoride free toothpaste is thoughtfully formulated with a bold blend of high quality ingredients like natural spearmint for unbelievable freshness. Beyond offering unbelievable freshness and moisturization, this fresh breath toothpaste also whitens by removing surface stains. Plus, this fluoride free whitening toothpaste removes plaque with regular brushing. But buckle-up, there's more goodness to this fluoride free toothpaste. hello Super Fresh Fluoride Free Toothpaste contains no artificial sweeteners, no dyes, no SLS, and this natural spearmint toothpaste is vegan. As if that weren't enough magic for one tube, hello toothpaste is not tested on animals. We're serious about being friendly, and about what goes into our toothpaste.

*Images dated August 7, 2025 (Target.com)*

**Hello Antiplaque Whitening Toothpaste Fluoride Free**




Hello Antiplaque Toothpaste, Fluoride Free for Teeth Whitening with Natural Peppermint Flavor and Tea Tree Oil, Peroxide Free, Gluten Free, SLS Free, 3 Pack, 4.7 OZ Tubes

Visit the hello Store

4.8 ★★★★★ 6,848 ratings | Search this page

Amazon's Choice

30K+ bought in past month

$14.91 ($1.06 / Ounce)

Get **Fast, Free Shipping** with Amazon Prime

FREE Returns

Save $2.88 on 2 select item(s) Terms

Size: **4.7 Ounce (Pack of 3)**

1 Count (Pack of 1) | **4.7 Ounce (Pack of 3)**

| | |
|---|---|
| **Material Type Free** | Fluoride Free, Artificial Sweeteners Free, Animal by-product free, Microbeads Free, Sodium Lauryl Sulfate Free, Triclosan Free, Sulfate Free, Gluten Free, Peroxide Free, Artificial Flavors Free, Paraben Free |

**About this item**

- WHAT I'M GETTING: Includes three (3) 4.7 oz tubes of hello Antiplaque Whitening Fluoride Free Toothpaste
- FARM TO TOOTHPASTE: This peppermint toothpaste pack is formulated with refreshing farm grown peppermint
- SEE YA STAINS: This whitening vegan toothpaste naturally whitens with mighty minerals by removing surface stains, helps brush away plaque, and shows tartar who's boss
- EVERYDAY YAY: Enjoy the refreshing taste of natural peppermint in this fluoride free whitening toothpaste and enjoy minty fresh breath to start your day
- ONLY GOOD STUFF ALLOWED: Contains no peroxide, no artificial sweeteners, no artificial flavors, no dyes, no titanium dioxide, and no SLS

*Images dated November 26, 2024 (Amazon.com)*

52. The above representations on labeling and in advertising, taken individually and/or collectively, lead reasonable consumers to believe that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant

levels of toxins like heavy metals, and (3) were safe for regular use as a toothpaste by young children (for the kids toothpastes).

53. Indeed, statements like “safe to swallow,” “no artificial sweeteners,” “Build good oral care habits,” “thoughtfully formulated with high quality ingredients,” “vegan,” “no bad stuff allowed,” “only good stuff allowed,” “no artificial sweeteners,” “no dyes,” “no parabens,” and “no titanium dioxide,” plus a description of the product as toothpaste for children, a “kids toothpaste,” or for “kids all ages,” (and similar label statements with minor variations), taken individually and collectively, all lead reasonable consumers to believe that the Products are safe for regular use and do not contain or risk containing detectable, significant, or unsafe levels of toxins like heavy metals.

54. Moreover, the list of undesired items that the Products boastfully do not contain are misleading because the Products contain or risk containing detectable and significant levels of heavy metals. The overall impression is that the Products do not contain or risk containing any levels of heavy meals, let alone significant or unsafe levels when used regularly.

55. Any reasonable consumer would consider the presence or potential presence of dangerous substances like heavy metals important information and contrary to the Products’ advertising. Indeed, had the mere presence or potential presence of heavy metals been disclosed by Defendant, reasonable consumers would not purchase the Products (or would have paid much less for the Products).

56. Further, had the presence or potential presence of dangerous substances at significant and unsafe levels been disclosed by Defendant, reasonable consumers would not purchase the Products (or would have paid much less for the Products).

57. When faced with two toothpaste options in a store—one which does not contain or risk containing significant levels of heavy metals, and another which contains or risks containing significant levels of heavy metals—reasonable consumers would avoid the latter. This is because consumers value high quality products that do not contain or risk containing detectable and significant levels of toxicants. Additionally, the presence of

lead and other heavy metals brings into question the Products' supposed competitive advantage—premium toothpaste without undesirable qualities, which consumers can use to maintain health and hygiene. Because the Products are deceptively advertised, reasonable consumers are deprived of making an informed choice.

58. The above deception is particularly material in the context of toothpaste. These Products are used daily and come in direct contact with a person's mouth. With each use, the Products are ingested or quickly absorbed into bodily systems, particularly when swallowed or placed under the tongue, and particularly by children.

59. Exposure to heavy metals should be avoided and minimized. So, the presence of heavy metals at detectable and significant levels in the Products is important to consumers. Based on the Products' packaging and advertising, reasonable consumers did not expect that the Products contained or risk containing detectable and significant levels of heavy metals.

**G. Defendant's Duty to Disclose.**

60. Defendant was obligated to disclose that the Products contained or risk containing detectable and significant levels of heavy metals because that information is contrary to the Products' labeling and advertising.

61. Defendant could have and should have prominently disclosed the limitations and omitted facts on packaging or at the point of sale—all prior to purchase. Had Defendant disclosed that the Products contain or risk containing detectable or significant levels of heavy metals, consumers would have been aware of it.

62. Superior Knowledge: Defendant is experienced in the design and manufacture of toothpaste like the Products at issue. On information and belief, as a manufacturer and company whose goal is to improve oral hygiene, Defendant is aware of the raw inputs used to manufacture the Products and, thus, was aware that the Products were manufactured with significant levels of heavy metals present in the finished Products. Further, on information and belief, Defendant conducts tests, including pre-sale testing, to verify the contents and specifications of the Products sold. Indeed, Defendant

repeatedly touts that its products are free of "bad" and harmful ingredients as a way to differentiate itself in the marketplace. Before purchasing the Products, consumers had no reasonable way to know the Products contained detectable heavy metals or significant levels or heavy metals.

63. Contrary/Partial Representations: As explained above, Defendant describes the Products on packaging and advertising as "safe to swallow," "no artificial sweeteners," "Build good oral care habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "only good stuff allowed," "no artificial sweeteners," "no dyes," "no parabens," and/or "no titanium dioxide," yet Defendant fails to disclose the presence (or risk of presence) of detectable, significant or unsafe levels of heavy metals. By disclosing some beneficial attributes about the Products' safety and expected performance, and by describing the absence of negative and undesirable attributes, Defendant is obligated to disclose material limitations that negatively affect the use of the Products. As explained above, based on the partial representations, consumers believe the Products do not contain detectable, significant, or unsafe levels of heavy metals like lead and mercury.

64. Defendant knows that reasonable consumers would find the presence or material risk of heavy metals and other toxins in premium toothpaste products material.

65. Defendant knows that reasonable consumers would not knowingly give their children premium toothpaste products that contained significant levels of heavy metals when the advertising represents the contrary.

**H. Plaintiffs' Experience.**

***Plaintiff Tal Nelkin***

66. Plaintiff Nelkin purchases toothpaste regularly, roughly every month or two. In the last three years, Plaintiff repeatedly purchased the Products, including from Amazon. For example, on May 1, 2023, Plaintiff purchased Hello Natural Watermelon Flavor Kids Fluoride Free Toothpaste from Amazon.com. On March 4, 2025 and May 17, 2024, Plaintiff purchased Hello Smiling Shark Fluoride Free Kids Toothpaste from

Amazon. And on February 5, 2025, September 18, 2024, March 31, 2024, and May 1, 2023, Plaintiff purchased Hello Antiplaque Whitening Toothpaste Fluoride Free for Adults.

67. Representative examples of the Products' packaging and advertising are shown in the paragraph 51, above.

68. Before purchasing the Products, Plaintiff viewed the portions of the Amazon.com listing descriptions the Products' beneficial attributes. Accordingly, as shown above, he saw that the Products were generally described as: "safe to swallow," "no artificial sweeteners," "Build good oral care habits," "thoughtfully formulated with high quality ingredients," "vegan," "no bad stuff allowed," "only good stuff allowed," "no artificial sweeteners," "no dyes," "no parabens," and/or "no titanium dioxide," plus a description of certain Products as toothpaste for children, "kids toothpaste," or for "kids all ages"—or similar statements with minor variations.

69. Plaintiff understood these statements by Defendant as representing that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) were safe for regular use as a toothpaste by young children (for the kids toothpastes).

70. Plaintiff relied on these representations in deciding to purchase the Products.

71. Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

72. Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

73. Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) heavy metals in excess of thresholds deemed safe by healthcare industry advocates.

74. The Products were not, in fact, truthfully advertised. Each Product Plaintiff purchased was worthless (or worth less than the purchase price) because it either contained or risked containing detectable, significant, and/or dangerous levels of heavy metals.

75. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's deceptive and unfair conduct.

76. Plaintiff continues to be interested in purchasing Hello-brand toothpaste that does not contain or risk containing detectable or significant levels of heavy metals, but will be unable to trust and rely on Defendant's packaging, and so will not purchase Defendant's Products. Plaintiff would be willing to purchase the Products again with the assurance that Defendant does not omit the presence of heavy metals on labeling, and that the Products do not contain or risk containing detectible or significant levels of heavy metals.

***Plaintiff Christine Prado***

77. On July 5, 2024, Plaintiff Prado purchased Hello Kids Dragon Dazzle Blue Raspberry Fluoride Toothpaste and Hello Naturally Whitening Fluoride SLS-Free Vegan Toothpaste from Target.com.

78. In May 2025, Plaintiff Prado again purchased Hello Naturally Whitening Fluoride SLS-Free Vegan Toothpaste from Target.com. She also purchased Hello Super Fresh Fluoride Free Toothpaste Natural Spearmint from Target.com.

79. Representative examples of the Products' packaging and advertising are shown in the paragraph 51, above.

80. Before purchasing the Products, Plaintiff viewed the portions of the Target.com listing describing the Products' beneficial attributes. Accordingly, based on the advertising and labeling images above, she viewed the following statements (or similar statements with minor variations): "polishes and brightens your lil' ones beautiful pearlies and tastes magical," "thoughtfully formulated with high quality ingredients," "thoughtfully formulated with natural flavor," "free from SLS, artificial sweeteners, dyes, artificial flavors, parabens, and gluten," "vegan," "no artificial sweeteners," "no artificial

flavors," "no dyes," "no preservatives," "no parabens," "no triclosan," "no brainer," "naturally whitening," "farm grown mint," "whitens naturally and gently," "tastes awesome and works brilliantly," "only the good stuff allowed," "kids ages 2+," plus a description of the Products as toothpaste intended to support good hygiene.

81. Plaintiff understood these statements by Defendant as representing that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) were safe for regular use as a toothpaste by young children (for the kids toothpastes).

82. Plaintiff relied on these representations in deciding to purchase the Products.

83. Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had she known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

84. Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had she known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

85. Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had she known that the Products contained (or risked containing) heavy metals in excess of thresholds deemed safe by healthcare industry advocates.

86. The Products were not, in fact, truthfully advertised. Each Product Plaintiff purchased was worthless (or worth less than the purchase price) because it either contained or risked containing detectable, significant, and/or dangerous levels of heavy metals.

87. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's deceptive and unfair conduct.

88. Plaintiff continues to be interested in purchasing Hello-brand toothpaste that does not contain or risk containing detectible or significant levels of heavy metals, but will be unable to trust and rely on Defendant's packaging, and so will not purchase Defendant's Products. Plaintiff would be willing to purchase the Products again with the assurance that Defendant does not omit the presence of unsafe levels of heavy metals on labeling, and

that the Products do not contain or risk containing detectible or significant levels of heavy metals.

## V. CLASS ACTION ALLEGATIONS

89. Plaintiffs bring this action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, and seek certification of the following class:

> **<u>California Class:</u>**
> All persons in California who purchased one or more Products during the Class Period.

90. The California Class is referred to as the "Class." Excluded from the Class are the Defendant, the officers and directors of the Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest. Also excluded from the Class are persons who purchased the Products for purposes of resale.

91. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date the class is certified.[37]

92. Plaintiff reserves the right to expand, limit, modify, or amend the class definition stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery. This includes subclasses based on individual products and sales channels.

93. **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is

---

[37] The Class Period begins at minimum 4 years from the date of filing of this action, but based on tolling, may extend beyond that date.

unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiffs allege that there are in excess of 5,000 members of the Class.

94. **Typicality.** Plaintiffs' claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendant's course of conduct as described herein.

95. **Adequacy of Representation.** Each Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Each Plaintiff has retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiff and counsel intend to diligently prosecute this action.

96. **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

a. Whether the Defendant manufactured, distributed, advertised, marketed, and/or sold the Products.

b. Whether the Products contain or risk containing detectable and significant levels of lead or mercury.

c. Whether the Products contain or risk containing unsafe levels of lead or mercury.

d. Whether Defendant knew or should have known the Products contained or risked containing significant or unsafe levels of lead or mercury.

e. Whether a reasonable consumer would consider the presence of the heavy metals described herein to be material.

f. Whether Defendant misrepresented the Products to be of a particular standard or quality.

g. Whether Defendant intended not to sell, manufacture, or distribute the Products as advertised and labeled.

h. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

i. Whether Defendant breached implied warranties under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, et seq. ("Song-Beverly Act").

j. Whether Defendant engaged in "unlawful," "unfair," or "fraudulent" business acts or practices in violation of the California Unfair Competition Law under Business & Professions Code § 17200, et seq.

k. Whether Defendant engaged in unfair or deceptive business practices in violation of the California Consumers Legal Remedies Act, Business & Professions Code § 1750, et seq.

l. Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class.

m. Whether Defendant intentionally or recklessly omitted and/or failed to disclose that the Products contain or risk containing the significant and unsafe heavy metals described herein.

n. Whether Defendant concealed that Products contain or risk containing the significant and unsafe levels of heavy metals described herein.

o. Whether Plaintiff and the Class are entitled to damages, restitution, and disgorgement from Defendant.

p. Whether injunctive relief is appropriate and necessary to enjoin Defendant from continuing to supply the Products as manufactured and advertised.

97. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file

an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

98. **Substantial Similarity**. On information and belief, the Products at issue in the action are substantially similar in all material respects. Namely, the Products consist of substantially the same ingredients and source materials, contain or risk containing the same or similar levels of heavy metals, are manufactured using the same or similar raw inputs, and are produced using the same or similar manufacturing processes. Additionally, the Products' labeling and advertising all misrepresent the Products as free of harmful ingredients like heavy metals, free of significant levels of heavy metals, and safe for ordinary and regular use, and fail to disclose that the Products contain (or risk containing) significant and unsafe levels of heavy metals contrary to advertising. The Products are also all sold, manufactured, distributed or otherwise supplied by Defendant.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS AND DELAYED DISCOVERY

99. All applicable statutes of limitations have been tolled by the delayed discovery doctrine. Plaintiffs and Class Members could not have reasonably discovered Defendant's practice of introducing Products latent with disease- and cancer-causing substances at significant and unsafe levels into the marketplace, at any time prior to commencing this class action litigation.

100. A reasonable consumer purchasing Defendant's Products would simply believe that the Products are free of detectable, significant, and unsafe levels of heavy metals linked to cancers and diseases. Nothing in Defendant's marketing or advertising of the Products would lead a reasonable consumer to suspect the existence or potential existence of carcinogenic or highly toxic ingredients, let alone at significant and dangerous levels.

101. No reasonable consumer could have independently discovered that Defendant's Products are latent with carcinogens and health-deteriorating toxins, including at dangerous levels. Like Plaintiffs, the reasonable consumer does not have access to sophisticated scientific resources, nor is the reasonable consumer trained to test the Products for toxins and evaluate their comparative safety. Relying on Defendant's representations of the quality and characteristics of the Products as safe for ordinary use, Plaintiff nor any reasonable consumer knew such scientific testing was needed.

102. Plaintiffs did not learn of the presence or potential presence of heavy metals as alleged herein until shortly before commencing this action.

103. As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## <u>FIRST CAUSE OF ACTION</u>

## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (UCL)

**(Cal. Bus. & Prof. Code §§ 17200, et seq.)**

**(On Behalf of the California Class)**

104. Plaintiffs restate the preceding allegations as if set forth herein.

105. California Business and Professions Code section 17200 et seq., known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unfair or fraudulent business act or practice" as well as "unfair, deceptive, untrue or misleading advertising."

***Fraudulent***

106. Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

107. Reasonable consumers are likely to be deceived by Defendant's conduct as alleged above.

108. As detailed above, the representations on labeling and in advertising, taken individually and/or collectively, lead reasonable consumers to believe that the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) were safe for regular use as a toothpaste by young children (for the kids toothpastes).

109. In truth, the Products contain or risk containing detectable and significant levels of heavy metals. Additionally, the Products are dangerous because they contain or risk containing unsafe levels of heavy metals and therefore are of an inferior quality and trustworthiness and do not contain the qualities and characteristics as represented.

110. A significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, would be misled by Defendant's representations and omissions of the Products' qualities and characteristics.

111. Reasonable consumers do not expect a premium toothpaste company would encourage exposure to high levels of heavy metals like lead and mercury multiple times a day. Heavy metals provide no benefits and should be avoided.

112. Reasonable consumers consider the presence of heavy metals a material fact when choosing premium toothpaste products, like the Products, which are advertised as not having various negative attributes.

113. Defendant also omitted and failed to disclose material information that is contrary to Defendant's affirmative representations.[38] Specifically, Defendant failed to disclose that the Products contain or risk containing detectable and significant levels of heavy metals. Defendant could have and should have prominently disclosed the omitted information on labeling and point-of-sale advertising. Had Defendant disclosed the omitted information, Plaintiffs and reasonable consumers would have been aware of it.

114. As such, Defendant's deceptive acts are likely to mislead consumers acting reasonably under the circumstances. Defendant is aware of the raw inputs used to manufacture the Products and therefore is aware of the overall quality and characteristics of its products. Yet, Defendant represents to consumers that the Products have qualities or characteristics they do not and/or makes material omissions to induce consumer purchase.

115. Absent Defendant's misrepresentations, Plaintiffs and the Class would not have purchased the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the Products as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

116. Plaintiffs and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

117. Plaintiffs and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

118. Exposure to heavy metals should be avoided and minimized, and disclosure of the presence of heavy metals in products intended to be used regularly is material.

119. Had the omitted information been disclosed, Plaintiffs and the Class would have been aware of it and reasonably would have behaved differently. Among other things,

---

[38] For clarity, Plaintiffs' omission claims in this Complaint are not based on any failure to disclose heavy metals in the "ingredients list" section of packaging. Plaintiffs' allege any disclosures should have been provided elsewhere on labeling and in advertising.

they would not have purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much for the items as they did.

120. As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and members of the Class.

***Unfairness***

121. Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

122. Defendant's deceptive marketing gave consumers the false impression that its Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) were safe for regular use as a toothpaste by young children (for the kids toothpastes), as described above.

123. Defendant's conduct was and continues to be of no benefit to reasonable consumers. It is misleading, unfair, unlawful, and is injurious to consumers. It is also against public policy, as it harms fair competition. For example, the federal Lanham Act includes prohibitions on "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 41 U.S.C. § 1125(a). Defendant is siphoning sales away from sellers, manufacturers, and distributors who compete fairly and do not materially misrepresent their Products to consumers. Further, there is no benefit to consumers who pay for Defendant's Products containing (or risk containing) detectible and significant levels of heavy metals when the Products are advertised to the contrary.

124. The harm to Plaintiff and members of the Class outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the unfair conduct described herein. Indeed, Defendant could have removed the heavy metals from the Products during the manufacturing process, or could have used different raw materials.

125. As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiffs and members of the proposed Class.

***Unlawful***

126. A cause of action may be brought under the "unlawful" prong of the UCL if a practice violates another law. Such action borrows violations of other laws and treats these violations as unlawful practices independently actionable under the UCL.

127. By making material misrepresentations and omissions about the Products, as alleged above, Defendant engaged in unlawful business acts and practices in violation of the UCL and predicate state laws. As described herein, Defendant violated (1) the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.; (2) the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.; and (3) the Song-Beverly Act, Cal. Civ. Code §§ 1790, et seq.

128. Plaintiffs, on behalf of themselves and the members of the Class, seek restitution and restitutionary disgorgement of all moneys received by Defendant through the conduct described above.

129. Plaintiffs, on behalf of themselves and the members of the Class, seek an injunction from this Court prohibiting Defendant from engaging in the patterns and practices described herein, including putting a stop to the misleading representations about the Products and the sale, manufacturing, or distribution of the Products containing or at risk of containing the levels of heavy metals alleged in this Complaint. Plaintiffs and Class Members are entitled to injunctive relief. On information and belief, the dissemination of Defendant's Products are ongoing.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CLRA)**

**(Cal. Civ. Code §§ 1750, et seq.)**

**(On Behalf of the California Class)**

130. Plaintiffs restate the preceding allegations as if set forth herein.

131. The CLRA prohibits deceptive practices concerning the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

132. Plaintiffs and California Class Members are "consumers" as defined by Civil Code § 1761(d).

133. Defendant is a "person" as defined by Civil Code § 1761(c).

134. The Products qualify as "goods" as defined by Civil Code § 1761(a).

135. Plaintiffs and the Class Members' purchase of the Products are "transactions" as defined by Civil Code § 1761(e).

136. The CLRA deems the following "unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer" as unlawful.

> (a) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);
>
> (b) "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);
>
> (c) "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and
>
> (d) "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

137. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it

represented, through its advertising and labeling, that the Products had characteristics that they did not actually have and were of a quality that they are not.

138. As detailed above, the representations on labeling and in advertising, taken individually and/or collectively, lead reasonable consumers to believe the Products (1) did not contain or risk containing heavy metals in any amount, (2) were free from significant levels of toxins like heavy metals, and (3) were safe for regular use as a toothpaste by young children (for the kids toothpastes).

139. In truth, the Products contain or risk containing detectable and significant levels of heavy metals. Additionally, the Products are dangerous because they contain or risk containing unsafe levels of heavy metals and therefore are of an inferior quality and trustworthiness and do not contain the qualities and characteristics as represented.

140. A significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, would be misled by Defendant's representations and omissions of the Products' qualities and characteristics.

141. Reasonable consumers do not expect a premium toothpaste company would encourage exposure to high levels of heavy metals like lead and mercury multiple times a day. Heavy metals provide no benefits and should be avoided.

142. Reasonable consumers consider the presence of heavy metals a material fact when choosing premium toothpaste products, like the Products, which are advertised as not having various negative attributes.

143. Defendant also omitted and failed to disclose material information contrary to the representations. Specifically, Defendant failed to disclose that the Products contain or risk containing detectable and significant levels of heavy metals. Had Defendant disclosed the omitted information at the point-of-sale, Plaintiffs and reasonable consumers would have been aware of it.

144. As such, Defendant's deceptive acts are likely to mislead consumers acting reasonably under the circumstances. Defendant is aware of the raw inputs used to manufacture the Products and therefore is aware of the overall quality and characteristics

of its products. Yet, Defendant represents to consumers that the Products have qualities or characteristics they do not and/or makes material omissions to induce consumer purchase.

145. Absent Defendant's misrepresentations, Plaintiffs and the Class would not have purchased the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the Products as they ultimately did. Plaintiffs and the Class's reliance was a substantial factor in causing them harm.

146. Plaintiffs and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

147. Plaintiffs and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

148. Exposure to heavy metals should be avoided and minimized, and disclosure of the presence of heavy metals in products intended to be used regularly or used for children is material.

149. Had the omitted information been disclosed, Plaintiffs and the Class would have been aware of it and reasonably would have behaved differently. Among other things, they would not have purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much for the items as they did.

150. As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and members of the Class.

151. Plaintiffs, through counsel, provided notice to Defendant pursuant to Cal. Civ. Code § 1782(a) via certified mail on May 20, 2025 and August 8, 2025. Because the 30-day period has expired, Plaintiffs seek all available remedies under the CLRA, including money damages, punitive damages, and injunctive relief.

**THIRD CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE SONG-BEVERLY ACT**

**(Cal. Civ. Code § 1790, et seq.)**

**(On Behalf of the California Class)**

152. Plaintiffs restate the preceding allegations as if set forth herein.

153. Under the Song-Beverly Act, Cal. Civ. Code § 1790. et seq., every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in the Act.

154. The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

155. Plaintiffs and the Class Members who purchased the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

156. Defendant is in the business of manufacturing and/or producing the Products and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

157. Defendant impliedly warranted to retailer buyers that the Products were merchantable and conformed to the promises or affirmation of fact made on the container or label. Cal. Civ. Code § 1791.1(a).

158. Defendant breached these implied warranties as described above. Specifically, as explained above, the Products are represented as free from significant levels of toxins and contaminants like heavy metals, and did not contain or risk containing heavy metals in any amount, let alone in excess of thresholds deemed significant and/or unsafe.

159. The Products were defective at the time of sale. The issue as described in this Complaint was latent in the Products and not discoverable at the time of sale. Though the Products appear usable when new, the defect existed at the time of sale and throughout the one-year period under the Song-Beverly Act. Accordingly, any subsequent discovery of

the safety defect by Class Members beyond that time does not bar an implied warranty claim under the Song-Beverly Act.

160. Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

161. As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been injured and harmed because they would not have purchased the Products (or at minimum would have paid much less) if they knew the truth, namely, that the Products were not as labeled, unfit for ordinary use, and posed a significant health and safety risk.

162. Plaintiffs and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## FOURTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

## (On Behalf of the California Class)

163. Plaintiffs restate the preceding allegations as if set forth herein.

164. For the children's Products, Defendant issued an express warranty on the Products' labeling and advertising that the Products are (1) either suitable for "kids all ages" or "kids age 2+," and (2) "safe to swallow." Defendant breached this express warranty because, as explained above, the Products contain or risk containing significant and unsafe levels of heavy metals thus rendering the products unsafe for kids and unsafe to swallow.

165. Defendant also issued an express warranty on all Products' labeling that the Products do not contain or risk containing harmful ingredients in any quantity.

166. Defendant also issued an express warranty on all Products' labeling that the Products do not contain or risk containing harmful ingredients in significant quantities.

167. Defendant also issued an express warranty on the children's Products' labeling and advertising that the Products are safe for ordinary use by young children.

168. Defendant breached these express warranties because, as explained above, the Products contain or risk containing detectable and significant levels of heavy metals.

169. Defendant's affirmation of fact made to Plaintiffs and the Class became a part of the basis of the bargain, thereby creating warranties that the Products would conform to Defendant's affirmations of fact.

170. Plaintiffs and the Class were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they had known the true facts, or would have paid less for the Products, and the Products did not have the quality, effectiveness, or value as promised.

171. As a result, Plaintiffs and the Class have been damaged in the full amount of the purchase price of the Products, or at minimum a portion of the purchase price of the Products.

**<u>FIFTH CAUSE OF ACTION</u>**

**UNJUST ENRICHMENT/QUASI-CONTRACT**

**(On Behalf of the California Class)**

172. Plaintiffs restate the preceding allegations as if set forth herein.

173. Plaintiffs plead this claim under California law and in the alternative to their remaining claims.

174. California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim. *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 756 (9th Cir. 2015).

175. California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020).

176. California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.

177. Under California law, a stake in unjustly earned profits exists regardless of the plaintiff's actual loss.

178. By its wrongful acts and omissions, Defendant was unjustly enriched at the expense of and to the detriment of Plaintiff and the Class and/or while Plaintiffs and the Class were unjustly deprived. Defendant's unlawful and deceptive misrepresentations induced Plaintiffs and the Class to spend money they otherwise would not have spent, purchase items they otherwise would not have purchased, and/or spend more money for a product than they otherwise would have absent such unlawful practices.

179. Plaintiffs and members of the Class also conferred a monetary benefit on Defendant in the form of Defendant's profits generated by the deceptive misrepresentations and omissions. Defendant profited from making false representations and omissions of material fact.

180. On behalf of the Class, Plaintiffs seek restitution from Defendant and an order disgorging all payments and profits obtained by Defendant from Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully prays for following relief:

a. Certification of this case as a class action on behalf of the proposed Class and any subclasses defined above, appointment of Plaintiffs as Class representative, and appointment of counsel as Class counsel;

b. An award to Plaintiffs and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits Defendant obtained from Plaintiff and the proposed Class as a result of its unlawful, unfair and fraudulent business practices described herein;

c. An injunction ordering Defendant to cease advertising the Products with the misrepresentations and omissions complained of herein;

d. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct where available;

e. An award of nominal, punitive, and statutory damages where available;

f. Reasonable expenses and attorneys' fees where available;

g. Pre- and post-judgment interest, to the extent allowable; and

h. For such further relief that the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury for all claims so triable.

Dated: September 19, 2025

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC

By: */s/ Alexander E. Wolf*

ALEXANDER E. WOLF (SBN 299775)
awolf@milberg.com
JOHN J. NELSON (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872-365-7060

WILLIAM J. EDELMAN (SBN 285177)
wedelman@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: 771-474-1121